**FEDERAL MARITIME COMMISSION,**
Petitioner-Appellee,

v.

**NEW YORK TERMINAL CONFERENCE**
et al., Respondents-Appellants.

No. 341, Docket 31015.

United States Court of Appeals
Second Circuit.

Argued Jan. 23, 1967.

Decided Feb. 15, 1967.

John Williams, Kirlin, Campbell & Keating, New York City (Elmer C. Maddy, New York City, of counsel), for respondent-appellant United States Lines Co.

Elkan Turk, Jr., New York City (Randolph W. Taylor, Burlingham, Underwood, Barron, Wright & White, New York City, of counsel), for appellants New York Terminal Conference and its members.

David L. Rose, Dept. of Justice, Barefoot Sanders, Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, Howard J. Kashner, Atty., Dept. of Justice, Washington, D. C., for Federal Maritime Commission.

Zelby & Burstein, New York City (Herbert Burstein, Arthur Liberstein, New York City, of counsel), submitted brief of intervenor, Empire State Highway Transp. Ass'n.

Before MOORE and FRIENDLY, Circuit Judges, and BRYAN, District Judge.*

FRIENDLY, Circuit Judge:

The zeal for the enforcement of the Shipping Act recently if somewhat belatedly displayed by the Federal Maritime Commission [1] has aroused a spate of industry resistance to demands under § 21 and subpoenas for investigations under § 22 of that statute. This case, primarily an investigation of acts pursuant to an agreement of terminal operators fixing rates and practices in the Port of New York, joins the procession, see Pacific Westbound Conference v. United States, 332 F.2d 49 (9 Cir. 1964); Far East Conference v. FMC, 119 U.S.App.D.C. 110, 337 F.2d 146 (1964), cert. denied, 379 U.S. 991, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965); FMC v. Caragher, 364 F.2d 709 (2 Cir. 1966); FMC v. DeSmedt, 366 F.2d 464 (2 Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 513, 17 L.Ed.2d 437 (1966), where the resistance has been unsuccessful save in the important respect of producing long delay. The subpoenas here, initially returnable on June 7, 1966, were met by a motion to quash which the hearing examiner denied on June 21. This was followed by a motion for an interlocutory appeal to the Commission which was denied on July 22. A month later, the recipients of the subpoenas still refusing to comply, the Commission petitioned the District Court for the Southern District of New York for enforce-

---

* Of the Southern District of New York, sitting by designation.

1. See Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 635, 639–40 (1965):

"* * * between 1916 and 1959 no penalties were imposed under the penal provisions of the Shipping Act, and only 127 proceedings under the foreign trade provisions of sections 14 to 17 were reported, of which about half resulted in regulatory orders."

ment. After several months had been consumed in the exchange of memoranda, Judge Levet filed an opinion on December 2 granting enforcement of the subpoenas with a single verbal amendment of no importance; later, on December 13, he signed an order refusing a stay but postponing the return date of the subpoenas until December 29 to afford opportunity for application to this court. When appellants took this appeal and moved for a stay, we set a schedule that would bring the case on for argument on January 23, 1967, and the Commission agreed not to seek compliance pending disposition of the appeal. The investigation has thus been stalled in its tracks for eight months, quite needlessly as this opinion shows. We commend Judge Levet for declining to grant a stay of his order enforcing the subpoenas; it is apparent that, on our part, we must look on motions for stays of administrative subpoenas pending appeal with even more circumspection than in the past.[2]

The instant proceeding was triggered when the New York Terminal Conference, an association of terminal operators and of ocean carriers conducting terminal services, issued, on September 1, 1965, a supplement to its Truck Loading and Unloading Tariff increasing rates by 12%. This increase was superimposed on a 5% increase of the year before. Several interested parties protested to the FMC on the grounds that the increases were unreasonably high and would result in a level of rates at New York that were grossly out of line with those of other North Atlantic ports. Empire State Highway Transportation Association, Inc., a trade association of motor carriers serving the Port of New York, filed a formal complaint under § 22. The Conference sent a letter to the Commission in answer to the protests alleging that the increases were justified solely on the basis of higher labor costs. On December 14 the Commission initiated a proceeding on Empire's complaint and also an investigation on its own account "pursuant to sections 15, 16, 17 and 22 of the Shipping Act, 1916" because after preliminary review "it appears that the increased rates will produce significantly more revenue than required to offset the increased labor costs." In April 1966, when United States Lines Company and Cunard Steamship Company, not members of the Conference, filed tariffs with comparably increased rates for truck loading and unloading, the Commission entered a supplemental order joining them as parties to permit investigation of these rates under §§ 16 and 17.

The subpoenas, issued to the Conference, its members, United States Lines and Cunard, required the production of all documents describing their stevedoring and terminal functions, identifying for whose account truck loading and unloading charges are assessed, or showing the costs incurred; copies of all stevedoring contracts and of all contracts with ocean carriers providing for payment to them of revenues collected from truckers; detailed financial and statistical statements of terminal operations for 1964 and 1965, with particular emphasis on the increases in costs; and copies of all complaints as to rate increases or for rate relief.

Of the many objections to the subpoenas urged in the District Court, the only one pressed here is that the investigation exceeded the FMC's statutory authority. The claim is that the Commission's true objective is to fix the rates, a power allegedly withheld by Congress both as to terminal operators and as to foreign commerce generally although granted by § 18(a) as to "common carriers by water in interstate commerce".

2. Congress might well consider whether the long record of frustration and less restrictive modern notions of the separation of powers might not make it wise to empower at least some administrative agencies to enforce subpoenas without having to resort to the courts in every case. See Gellhorn and Byse, Administrative Law, Cases and Comments 605 (4th ed. 1960); Note, Use of Contempt Power to Enforce Subpoenas and Orders of Administrative Agencies, 71 Harv. L.Rev. 1541, 1552 (1958).

■ The appeal of the Conference and its members is readily decided. In doing so we are not required to determine whether, as they urge, Judge Levet's holding that the subpoenas were properly issued because of the Board's power under the second paragraph of § 17 to prescribe "a just and reasonable regulation or practice" whenever the Commission finds that any carrier or any "other person subject to this chapter"[3] is acting pursuant to "unjust or unreasonable" regulations or practices "relating to or connected with the receiving, handling, storing, or delivering of property," gave too broad a reading to State of California v. United States, 320 U.S. 577, 64 S.Ct. 352, 88 L.Ed. 322 (1944). Neither need we decide a point which was not argued to us, namely, whether the judge's view that the subpoenas were supportable by virtue of the anti-discrimination provisions of the statute gave inadequate weight, at least with respect to certain parties, to the principle long recognized under § 3 of the Interstate Commerce Act that removal of discrimination between localities can be ordered only when a carrier or group of carriers is "the common source" by virtue of their participation in the several rates. See Texas & Pacific R.R. v. United States, 289 U.S. 627, 650, 53 S.Ct. 768, 77 L.Ed. 1410 (1933); Central R.R. Co. of New Jersey v. United States, 257 U.S. 247, 259–260, 42 S.Ct. 80, 66 L.Ed. 217 (1921); but see New York v. United States, 331 U.S. 284, 340–349, 67 S.Ct. 1207, 91 L. Ed. 1492 (1947); Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 593–594, 69 S.Ct. 278, 93 L.Ed. 243 (1947); New York Central R.R. v. United States, 207 F.Supp. 483, 489–490 (S.D.N.Y. 1962); and Note, Rate Regulation in Ocean Shipping, 78 Harv.L.Rev. 635, 647–49 (1965). However any such arguments may stand, the subpoenas were firmly grounded on § 15 which, in providing for the filing and approval of conference agreements and the grant of immunity from the antitrust laws, authorizes the Commission, after notice and hearing, to "disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds * * * to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter".

■ Congress here employed the broadest possible language, as it had every reason to do in empowering the Commission to terminate an exemption from the antitrust laws which was being misused, see Edmond Weil, Inc. v. Italian Line, "Italia," 1 U.S.S.B.B. 395, 398 (1935)—action more feasible than it may usually be with respect to foreign commerce when, as here, the agreement concerns only terminal services in an American port. Whatever the limitations on the Commission's rate making powers, Congress clearly did not mean to strip it of authority to disapprove an agreement that was being used to maintain exorbitant rates, and thereby to allow the forces of competition to work again. Appellants' argument that "detriment to the commerce of the United States" or results "contrary to the public interest" could ensue only from the level of the charges and that the cost of the service is thus irrelevant scarcely warrants discussion; a high rate yielding terminal operators an outrageous profit would be detrimental to United States commerce and contrary to the public interest whereas an identical rate which was needed to permit a reasonable return for the service after deducting the expense for labor in American ports would be something that United States commerce simply has to bear. All this is so self-evident that it is difficult to believe that experienced business men and hard-nosed lawyers required judicial instruction.[4] Needless to

---

3. The latter phrase concededly includes terminal operators, see § 1.

4. We are unable to share appellants' professed concern over a statement of the

Commission's Hearing Counsel that the data sought were necessary to enable the staff "to compile a cost exhibit, in order to determine whether the rates, the truck-loading and unloading rates of the

say we do not suggest that the rates are in fact exorbitant; we say only that the Commission has a duty to find out.

■ United States Lines Company [5] argues that however all this may be as to the other recipients of subpoenas, § 15 affords no authority as to it since it is not a member of the Conference. We are not required to consider whether any needed authority could be found in the provisions of § 18(b) (5) empowering the Commission to "disapprove any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States," which we applied in FMC v. Caragher, supra, 2 Cir., 364 F.2d 709, and FMC v. DeSmedt, supra, 2 Cir., 366 F.2d 464, although that section was not cited in the order initiating the investigation.[6] The information sought of United States Lines was relevant to the investigation of the conference even though no order under § 15 could affect that company. If United States Lines' costs should prove to be lower than those of some conference members, the Commission would be fortified in concluding that the agreement was having a detrimental effect on the commerce of the United States both by sheltering inefficiency on the part of members and by encouraging non-members to charge more than they might if

the forces of competition prevailed. Conversely, if some members' costs were lower than United States Lines', the Commission might conclude that restoring competition would force United States Lines either to reduce its own costs or to hire a more efficient terminal operator. In their search for illumination administrative agencies are no more limited to the parties against whom complaint is made than are the courts. Section 27 says that the Commission "may by subpoena compel the attendance of witnesses and the production of books, papers, documents, and other evidence * * *"; Congress would hardly have authorized the Commission to subpoena non-party witnesses but not their books and records which may be far more enlightening. See Freeman v. Brown Bros. Harriman & Co., 250 F.Supp. 32 (S.D.N.Y.), aff'd 357 F.2d 741 (2 Cir.), cert. denied, Meyer Yausner Sales, Inc. v. Freeman, 384 U.S. 933, 86 S.Ct. 1446, 16 L.Ed.2d 532 (1966), and cases there cited. Furthermore since United States Lines serves other American ports, the subpoena on it was authorized by § 16 First and perhaps also by the first paragraph of § 17, see fn. 6, however the case stood under those sections as to the Conference and members confining their operations to New York harbor.

The order enforcing the subpoenas is affirmed; the mandate will issue forthwith.

respondent Terminal Conference, are just and reasonable and, therefore, lawful" and that "we feel that we have this authority under Section 17 of the Shipping Act, 1916, to construct a rate case." Even if we assume, *arguendo*, that counsel was mistaken either as to the purposes for which the materials were needed or as to the scope of the Commission's power under § 17, the information was needed to enable the Commission to determine whether, as stated in the order initiating the investigation, "the New York Terminal Conference in increasing

its rates may be taking undue advantages of competitive immunities granted to it under its approved section 15 agreement * * *" and we shall not assume the Commission will act beyond its powers.

5. The Commission did not seek enforcement of the subpoena against Cunard.

6. We were told at the argument that shipping lines are contesting elsewhere the applicability of § 18(b) (5) to terminal charges of common carriers by water and consequently intimate no opinion on that issue.