**A. O. SMITH CORPORATION et al.,**
Plaintiffs,

v.

**FEDERAL TRADE COMMISSION et al.,**
Defendants.

Civ. A. No. 75–15.

United States District Court,
D. Delaware.

Feb. 19, 1975.

**1110**

Richard F. Corroon, Charles F. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., Gilbert J. Helwig, Edward T. Tait, Lee A. Rau, John M. Wood, Reed, Smith, Shaw & McClay, Washington, D. C., for plaintiffs A. O. Smith, and others.

Ralph Keil, U. S. Atty., Wilmington, Del., Calvin J. Collier, Gerald Harwood, James P. Timony, William A. Cerillo, Warren S. Grimes, Bruce E. Freedman, Federal Trade Commission, Washington, D. C., for defendant Federal Trade Commission.

Ralph Keil, U. S. Atty., Wilmington, Del., for defendant General Accounting Office.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This case arises from a complaint filed by A. O. Smith Corporation ("Smith") and six other corporations seeking a declaratory judgment and preliminary and permanent injunctive relief against the Federal Trade Commission ("Commission" or "FTC"), its chairman and each commissioner separately, and the Comptroller General of the United States. This suit is, in effect, a request for pre-enforcement judicial review of an order by the Commission requiring the plaintiffs, along with 338 other large corporations engaged in manufacturing in the United States, to file with the Commission annual line-of-business reports ("LB Reports").[1] The grounds for relief asserted in the complaint are, *inter alia*, lack of statutory authority to issue the order, failure to follow the rule-making procedure prescribed by the Administrative Procedure Act ("APA"), undue burden required to prepare the report, and various constitutional grounds.

Defendants responded by filing a motion to dismiss for lack of jurisdiction.[2]

---

1. From the record it appears the Commission at one time contemplated receipt of LB Reports from 500 large manufacturing corporations representing 70% of the manufacturing capacity of the United States. The record is silent as to why the number of proposed reporting corporations was reduced to 345 and the percentage of manufacturing capacity represented by those companies. Nonetheless, one can infer the percentage of manufacturing capacity of the proposed reporting companies is significant.

2. Defendants' motion cites "lack of jurisdiction" without specifying whether subject matter or personal jurisdiction is implied. Defendants' Brief Outline cites an absence of "subject matter jurisdiction," and the brief itself makes clear this includes issues of justiciability (e. g. ripeness) and limitations on a court's discretion to invoke equitable remedies.

Defendants' motion was joined for hearing with plaintiffs' motion for preliminary injunction. This opinion contains the Court's decision on defendants' motion and constitutes its findings of fact and conclusions of law as to plaintiffs' motion for preliminary injunction.

## I. BACKGROUND

Pleadings, affidavits, and briefs establish the following undisputed facts.

During the period from August 1973 to August 1974 the Federal Trade Commission was evolving a plan which eventually became the current Line-of-Business Program ("LB Program"). On August 3, 1973 an early proposal for annual line-of-business reports was submitted to the Office of Management and Budget ("OMB") for approval as then required under the Federal Reports Act, 44 U.S.C.A. § 3501 et. seq. (1969).[3] Some oral comments apparently were received by OMB on the proposal, but no statement of approval was forthcoming from OMB, as then required by law, 44 U.S.C.A. § 3509(2) (1969), before Congress amended the Federal Reports Act on November 16, 1973 by enactment of Section 409 of thé Trans-Alaska Pipeline Authorization Act, P.L. 93–153, 44 U.S.C.A. §§ 3502, 3512 (1975 Supp.).

In March 1974 the Commission forwarded for approval a revised LB Report form to the Comptroller General of the United States, who assumed certain responsibilities previously held by OMB. During April and May of 1974 the Comptroller General received oral and written comments on the program. On May 13, 1974 the Acting Comptroller General formally approved with certain "provisions" the LB Report form which had been submitted to that office for review.

Meanwhile, the Business Roundtable ("Roundtable"), an unincorporated association of which most plaintiffs are members, through its attorneys, requested the Commission to hold hearings on its various proposed annual LB Reports by letters dated November 13, 1973, January 29, 1974 and March 21, 1974. The last letter also mentioned the necessity of the Commission complying with the APA. By letter dated April 4, 1974 the Commission denied these requests.

In May 1974 the Roundtable made a letter request that the Commission "fully comply" with the requirements of Section 409 of P.L. 93–153 by engaging in "meaningful exchange between the Commission and business representatives to 'advance the ease and accuracy of line-of-business reporting'" as expressed in a provision of the Acting Comptroller General's letter to the Commission and by exploring coordinating or consolidating the Commission's line-of-business data needs with data collected by other Federal agencies. The same letter again drew attention to the necessity for compliance with the APA. The Commission denied all requests and asserted the APA was inapplicable by letter dated June 11, 1974.

On June 14, 1974 a meeting was held between top financial executives from several domestic corporations assembled by the Roundtable and the Commission's Bureau of Economics staff. Views were exchanged but apparently not to the satisfaction of the Roundtable, which next requested by letter dated the same day that proposals raised by corporate representatives at the meeting be presented directly to the Commission at a special meeting. This last letter was never acknowledged, nor was such a meeting ever held.

On August 2, 1974 the Commission issued a "Resolution Requiring Annual Line of Business Reports from Corporations," which appeared on August 22 in the Federal Register. By this act the Commission resolved to adopt the LB Program requiring annual LB Reports to include detailed information as to

---

3. The statutes in question reference the "Director of the Bureau of the Budget." A 1970 Administrative Reorganization resulted in the terminology of Office of Management and Budget.

each corporation's affiliations and a breakdown of costs, profits, assets, and other expenditures according to line-of-business categories established by the Commission. Also on August 2, 1974 the Commission issued an identical "Order to File Special Report" ("Order") to 345 of the nation's largest manufacturing companies, requiring them to complete and file annual LB Reports. The initial report limited the data required as to each firm's fiscal year ending between July 1, 1973 and June 30, 1974. Subsequent reports were to include all the data indicated as required by the form itself although at oral argument the FTC indicated the LB Report form might be modified in the future. This Order and the accompanying form were served upon the instant plaintiffs on varying dates between August 13, 1974 and August 23, 1974. Filing with the Commission was required within 150 days of receipt of the Order or within 150 days of the end of the fiscal year, whichever was later. The Order ended with this warning: "You are advised that penalties may be imposed under applicable provisions of Federal law for failure to file this report or for the filing of a false report."

Pursuant to the Commission's Procedures and Rules of Practice, each plaintiff seasonably moved to quash the aforementioned orders in August and September 1974. On September 24, 1974 the Commission denied the motions of four of the plaintiffs, subject to a limited right to renew such motions "solely on the issues of undue burden and lack of confidentiality." In its denial the Commission stated neither the original motion to quash nor filing of a renewal motion would toll the 150 day period directed by the Commission. This right to renew or amend was also made available to those whose original

motions had not yet been acted upon by the Commission. Five of the seven plaintiffs did timely renew or amend their motions to quash, the last having been filed on October 29, 1974. The Commission not having disposed of plaintiffs' outstanding motions by December 27, 1974, and the 150 day period having nearly drawn to a close, counsel for plaintiffs wrote to the Commission pointing out its inaction was effectively becoming a denial on the merits in a manner violative of due process. On the same date, the Commission denied the three remaining plaintiffs' motions to quash; on January 7, 1975 the Commission denied all renewed or amended motions filed by plaintiffs.

Because the Commission's staff required considerable time to respond to all of these motions, the Director of the Commission's Bureau of Economics granted a thirty day extension of time to file the LB Report to all plaintiffs. The new deadline for filing was February 10, 1975 as to one plaintiff, February 17 as to five plaintiffs, and February 19 as to one plaintiff. Argument was had on plaintiffs' and defendants' motions on February 5, 1975. By letter to the Court dated February 7, 1975 the Commission advised that no injunctive enforcement action would be sought against any plaintiff until after February 19, 1975, and no notice of default would be served upon any plaintiff until this Court had issued its opinion on the pending motions.[4] Disposition of the motions requires a discussion of jurisdiction, ripeness, and the merits. With regard to the latter, all expressions are in the procedural context of an application for preliminary injunction.

## II. JURISDICTION

■■ But for the ripeness question raised by the seeking of pre-enforcement

4. The Court has been advised two other actions against the FTC are currently pending in the Southern District of New York which involve suits by several other corporations required to file LB Reports. In addition, the Commission has within the last two weeks initiated enforcement action in the Southern District of New York. Finally, six other actions similar to the matter *sub judice* were filed in this district on February 14, 1975.

review of Federal agency action, this Court has non-discretionary jurisdiction to entertain plaintiffs' complaint. Because this case arises under the Federal Trade Commission Act, September 26, 1914, 38 Stat. 717, as amended, 15 U.S. C.A. § 41 et seq., and the requisite amount appears to be in controversy as to each plaintiff, this Court has Federal Question jurisdiction under 28 U.S.C.A. § 1331.[5] Alternatively, jurisdiction under 28 U.S.C.A. § 1337[6] is obvious because the Federal Trade Commission Act falls clearly within the ambit of that statute. Because jurisdiction is so easily found, other bases of jurisdiction urged by plaintiffs as conferring jurisdiction will not be considered.

 Because plaintiffs urge this Court to review action of a federal agency, reference must be made to the APA to ascertain whether it contains any provision which would deprive the Court of jurisdiction. Plaintiffs urge they are aggrieved by final agency action and are entitled to judicial review thereof under Section 10 of the Administrative Procedure Act, 5 U.S.C.A. §§ 702, 704. In support, they cite the August 2, 1974 order and the final denial of their motions to quash dated January 7, 1975. There is a presumption of reviewability of final agency action under the APA.[7] Reference to the statute indicates two

grounds upon which review is to be denied:

"§ 701(a). This chapter [on judicial review] applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review;[8] or

(2) agency action is committed to agency discretion by law."

 The second ground is neither urged by defendants nor is any basis for asserting it readily obvious to the Court. As to the first ground, the legislative intent to preclude review must be "clear and convincing." Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 .L.Ed.2d 681 (1967).[9] Defendant has cited no legislative history and the Court has found nothing in the statute which suggests a Congressional intent to deny judicial review.

## III. RIPENESS

Under the *Abbott Laboratories* trilogy, and in view of the equitable relief here sought, the Court must now examine justiciability, focusing with particularity upon ripeness. Ripeness in the context of pre-enforcement review involves a two-pronged test of 1) fitness of the issues raised for judicial review and 2) hardship to the plaintiffs if the Court refuses to hear the case.

5. § 1331. Federal question; amount in controversy; costs
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.
 \* \* \* \* \*

6. § 1337. Commerce and anti-trust regulations
 The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

7. Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) and cases cited therein. *See* 5 U.S. C.A. § 701(a).

8. No opinion is expressed as to the constitutionality of a statute which might deny judicial review.

9. Both parties agree that the Abbott Laboratories case and the cases of Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S. Ct. 1520, 18 L.Ed.2d 697 (1967), and Gardner v. Toilet Goods Association, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) constitute the relevant trilogy of Supreme Court opinions on the subject. Little force remains to older statements of the law on pre-enforcement review found in St. Regis Paper Co. v. United States, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961), and Federal Trade Commission v. Claire Furnace Co., 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978 (1927). *See* Docket 22, pp. 98–99, 137.

As to fitness of the issues, there are two prime considerations: (1) Are the issues tendered for resolution either purely legal ones or, if not, are the facts readily accessible to this Court? (2) Has there been final agency action within the meaning of Section 10(c) of the APA, 5 U.S.C.A. § 704? With respect to the first consideration, if important facts cannot now be known with certainty or if a judicial appraisal of factors surrounding the controversy would be on a surer footing in the context of a specific enforcement proceeding, then the Court should decline to hear the case.

Not one but several issues are presented for resolution. Plaintiffs allege the Commission exceeded its statutory authority in issuing the controverted order and that in any event it failed to follow appropriate rulemaking procedure under the APA. They also charge that the Comptroller General either exceeded his authority or failed to follow requirements imposed on him by the law. These issues are either purely legal or related to facts already in the record or easily accessible to this Court with the aid of the parties.

Another allegation that the required reports are unduly burdensome may, under plaintiffs' theory, require this Court to balance the burden of compliance with the value of the data collected. Assuming arguendo that the Court is within its proper province to consider the value of the data collected, this also would require facts either now in the record or easily accessible. No facts are now lacking which could best be developed by awaiting agency enforcement.

Plaintiffs also charge that ambiguous and, at times, contradictory reporting instructions, coupled with the requirement of certifying as true all data submitted at risk of criminal sanction, amounts to a violation of plaintiffs' due process rights under the Fifth Amendment. They also urge the reporting requirement constitutes a taking of property without due process because of its cost to plaintiffs and the alleged substantial risk of making confidential material public. Finally, plaintiffs urge the requirement violates their Fourth Amendment right to be free from unwarranted searches and seizures. These constitutional grounds are basically legal issues.

■ The Court finds the issues presented in this case fit for review at this time, in the sense that little benefit would be gleaned from postponing their judicial resolution.

■ The second aspect of fitness goes to whether the August 1974 orders and the subsequent denials of all motions to quash constitute final agency action within the meaning of Section 10(c) of the APA, 5 U.S.C.A. § 704. The Court has no problem finding these actions are final. These were not informal agency actions or the rulings of some subordinate agency official subject to review by a higher agency authority. Rather they were actions taken by the members of the Commission themselves. The August 1974 orders were made effective immediately upon their issuance, and they explicitly state that compliance is expected. They have the effect of law, and violations of the orders are punishable by criminal fines and imprisonment. They were every bit as final as if the Congress itself had enacted the orders and they had been signed into law. The FTC orders constitute final action and are fit for review.

Having found the issues fit for review, attention is now turned to the second prong of the ripeness test, *viz.*, hardship accruing to the plaintiffs if this Court withholds exercise of its jurisdiction.[10] What are the burdens suffered by plaintiffs if there is compliance vis-a-vis the detriments to be incurred by plaintiffs if they should choose noncompliance?

---

10. Hardship in the context of irreparable injury for preliminary injunctive relief is discussed *infra* pp. 1117–1118.

Four cases provide special guidance to this Court in determining whether the severity of hardship to a plaintiff in the form of costs of compliance versus costs of noncompliance is sufficient to cause a matter to be labeled "ripe" for pre-enforcement jurisdiction. Those cases are Abbott Laboratories v. Gardner, *supra,* Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), Gardner v. Toilet Goods Association, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) and General Motors Corp. v. Volpe, 321 F.Supp. 1112 (D. Del.1970), aff'd as modified, 457 F.2d 922 (3d Cir. 1972).

In Abbott Laboratories v. Gardner, *supra,* the plaintiffs would have been faced with substantial hardship whether they chose to comply or not to comply. If they chose to comply with the regulation there at issue, they would have been required to incur substantial costs in changing their promotional labeling and advertisements, destroying stacks of printed matter, and investing heavily in new supplies. These activities would have had a direct and immediate impact on their day-to-day affairs. If they chose noncompliance they incurred risks of severe criminal and civil penalties and seizure of their goods as "misbranded drugs" with attendant adverse publicity in a sensitive industry. The Court found sufficient hardship. 387 U.S. at 156, 87 S.Ct. 1507.

In Gardner v. Toilet Goods Association, *supra,* the Court found that plaintiffs would suffer a substantial burden, whether they would choose to comply or not with the regulation in question, in the absence of pre-enforcement review. Failure to comply would pose the same risks of criminal prosecution, civil injunction, or seizure of goods with the accompanying bad publicity found in *Abbott Laboratories.* Compliance would require changing immediately longstanding practices of pre-market testing and clearance to accommodate new items not previously covered by regulation. Great

expense would flow from such changes which would have a substantial impact upon day-to-day affairs of these plaintiffs. The Court found ripeness. 387 U.S. at 174, 87 S.Ct. 1526.

The issues were not found sufficiently ripe in Toilet Goods Association v. Gardner, *supra.* The failure to comply with the regulation at issue would create a risk of the FDA's suspending certification services to the plaintiff. Such suspension was open to immediate administrative review. It would not result in criminal sanctions or seizure of goods. The burden of complying involved no direct and immediate impact on plaintiff's day-to-day affairs and was one sufficiently remote in time and effect to be deemed speculative. At most there would be a possible future request for inspection of plaintiff's plant and facilities at which time certain confidential material might be exposed to agency officials which, in turn, could possibly lead to publication.

In General Motors Corp. v. Volpe, *supra,* the issue was the hardship to the plaintiff corporation if the Court refused to hear a case involving a National Highway Safety Board order. The order directed the plaintiff to notify owners of certain GM trucks of a safety hazard resulting from use of a particular type of wheel last incorporated in GM trucks five years prior to the date of litigation. The cost of noncompliance was a possible loss of $400,000 in civil penalties. No criminal or other sanctions were possible. The cost of compliance was found to be de minimis being only the cost of mailing the notices, and in no way could compliance affect the day-to-day affairs of the plaintiff because such trucks had not been sold for five years. The Court found no ripeness. 321 F.Supp. at 1131.

■ Turning to the facts in this case, the risks of noncompliance are evident from the enforcement sections of the Federal Trade Commission Act, 15 U.S. C.A. §§ 49, 50. Plaintiffs would be sub-

ject to an enforcement action,[11] criminal sanctions of up to three years imprisonment and $5,000 fine,[12] and civil penalties of $100 per day beginning thirty days after receipt of a notice of default.[13]

The burden of compliance is also substantial. Significant, time-consuming, and costly[14] efforts will be required to prepare the LB Reports. Initially there is the need to review past transactions to supply data of sufficient quality to satisfy the requirement for certification. Because the Commission has announced its intention that this program will be a continuing one, some companies understandably feel they must take immediate steps to anticipate future reporting requirements to produce consistent results from year to year. Meanwhile the Commission has not specified what those requirements will be in future years, except that they will likely be different than those now incumbent upon affected corporations. In addition there is a necessary diversion and dispersion of executive time and talent which has an indirect impact on the day-to-day affairs of business.

Plaintiffs also allege compliance will redound to their detriment in the form of possible breaches of confidentiality[15] and by misleading the public through publication of false or erroneous material.[16] As to these the burden is too speculative, based upon information now available, for the Court to consider in determining ripeness.

In summary, the risks of noncompliance are substantially greater than that found in *Toilet Goods,* but substantially less than in *Abbott Laboratories* or *Gardner* where seizure and adverse publicity were prominent considerations. Drawing a comparison with the *General Motors* case is less easy since civil penalties per plaintiff would probably be substantially less but there is present in the matter *sub judice* criminal sanctions which were not a factor in *General Motors.* The hardships of compliance are greater than in *Toilet Goods* and *General Motors,* but less than in *Abbott Laboratories* or *Gardner* both as to absolute monetary cost and type of impact on the day-to-day business affairs. In the instant matter the impact is indirect and hence of a less immediate consequential nature than the impact on day-to-day business affairs in *Abbott Laboratories* or *Gardner.* The severity of the hardship of compliance and noncompliance to these plaintiffs falls between that present in those cases used for guidance. On balance, the hardships are viewed as sufficiently great, immediate, and compelling regardless of whether compliance or noncompliance is pursued, to hold this controversy ripe for pre-enforcement review.

Having determined this matter to be ripe, attention is turned to the merits of plaintiffs' request for injunctive relief.

---

11. The Federal Trade Commission has expressed to this Court an "intention" to proceed against the plaintiffs for enforcement after February 19, 1975.

12. In the instant matter, FTC counsel advised the Court at oral argument of the unlikelihood of imposition of criminal sanctions. The Supreme Court has discounted analogous representations noting that the existence of the statutory criminal sanction is the governing criteria. *Cf.* Abbott Laboratories v. Gardner, *supra,* 387 U.S. at 154, 87 S.Ct. 1507.

13. The Court reads the February 7, 1975 letter of counsel for the Commission as the Commission not being prohibited from issuing notices of default if plaintiffs did not prevail on their motion for injunctive relief.

14. One plaintiff, W. R. Grace & Co., estimated its cost for compliance for the first year at $400,000. The FTC advised $50,000 per corporation was the median estimated cost of compliance by those corporations who chose to reveal that data to the Commission.

15. *See* Aluminum Co. of America, Inc. et al. v. FTC et al., 390 F.Supp. 301 (S.D.N.Y., 1975).

16. The latter argument goes to plaintiffs' continuing assertion that the data required will be useless to the Commission and, indeed, misleading to those who study it.

## IV. MERITS ON APPLICATION OF THE FACTS TO STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

■ The legal standard to be followed in this Circuit in determining whether to issue a preliminary injunction has been recently restated:

" '[A]s a prerequisite to the issuance of a preliminary injunction the moving party must generally show: (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the status quo.' A.L.K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761, 963 (3d Cir. 1971). Moreover, this court has repeatedly stated that the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919–920 (3d Cir. 1974).

### Immediate, Irreparable Injury

■ An analysis of immediate, irreparable injury must not only encompass the injury allegedly suffered by these plaintiffs, but also whether plaintiffs have an adequate remedy at law. Defendants vigorously contend that plaintiffs do have an adequate remedy at law in that they need only await enforcement proceedings at which time all grounds for relief raised in this proceeding can be raised as legal defenses in the enforcement proceeding to be brought in the Southern District of New York.[17] The Court does not concur. In the first place, there is no absolute assurance that the "present intention" of the Commission to initiate enforcement proceedings in the form of mandamus, 15 U.S.C.A. § 49, will in fact be carried out. Secondly, even if there were such assurances, it is difficult to imagine the Commission not urging upon the enforcement forum that the proceeding is summary in nature thereby depriving plaintiffs of the opportunity to engage in discovery, if necessary, so as to buttress their "undue burden" theory.[18] *Cf.* United States v. Associated Merchandising Corp., 256 F.Supp. 318 (S.D.N.Y. 1966); *see also* Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L. Ed.2d 580 (1971); Federal Maritime Commission v. New York Terminal Conference, 262 F.Supp. 225 (S.D.N.Y.), aff'd, 373 F.2d 424 (2d Cir. 1967). For this reason, this Court would be ill-advised to withhold ruling on plaintiffs' Motion for Preliminary Injunction so as to permit the FTC to commence an enforcement proceeding elsewhere. Finally, there appears to be little authority for the proposition that, in a case where plaintiff has no other action available, nonetheless he has an adequate remedy at law by waiting for some anticipated enforcement proceeding, not yet filed. General Motors Corp. v. Volpe, *supra*, and Travis v. Pennyrile Rural Elec. Co-op., 399 F.2d 726 (6th Cir. 1968), are distinguishable not only because all discovery could be fully employed in those enforcement proceedings, but also by reason of the pendency of the enforcement proceeding prior to a ruling on injunctive relief. It is concluded plaintiffs have no adequate remedy at law.

17. "The Commission agrees not to file notices of default against the plaintiffs pending your decision on the motions to dismiss and for a preliminary injunction. We further agree not to sue any of the seven plaintiffs for enforcement until after February 19, 1975, and to notify you before any such suit is instituted. Our present intention, however, for reasons hereafter noted is to proceed against the plaintiffs for enforcement in the Southern District of New York after February 19, 1975, if they are in default in complying with the orders." Portion of FTC February 7, 1975 letter addressed to the Court.

18. At oral argument, plaintiffs were unable to represent whether they would need additional discovery.

■ The alleged injury suffered by plaintiffs goes either to the unrecoverable costs and commitment of diverse business resources including managerial talent with concomitant loss of profits incident to preparation and compliance with the Commission orders plaintiffs assert ·to be invalid, or in the event of noncompliance, irreparable harm threatened by criminal and civil sanctions. The immediacy of the injury is evident; plaintiff has already incurred some costs incident to compliance and the time constraints placed upon plaintiffs by the FTC are narrow. The Court concludes plaintiffs will suffer immediate, irreparable injury.

### *The Possibility of Harm To Other Interested Persons*

■ The possibility of harm to other interested persons from the grant or denial of the injunction is non-existent or at best speculative. The Commission has suggested no such harm.

### *The Public Interest*

■ The Commission presumably represents the public interest. While not specifically appearing in the Commission resolution published in the August 22, 1974 Federal Register, two of the laudable avowed Commission objectives in seeking the LB Reports are to enable it to more intelligently utilize its own enforcement resources and, through publication of aggregated data, encourage improved resource allocation in the nation's economy.

The objective of more intelligent deployment of Commission enforcement resources will not be significantly affected by a delay of these seven corporate plaintiffs [19] in filing their LB Reports. For reasons which follow, the Court cannot say the public interest will be harmed by the issuance of an injunction. In fact, the Court cannot be confident the public interest might not benefit in the long run even if this Commission objective were temporarily frustrated.

The data to be collected in the initial LB Reports will "be unreliable at best, and may be seriously misleading" [20] because of a "fundamental dilemma [21] with regard to classification and related matters which is not yet fully resolved or compromised." The median cost to industry for collecting the unreliable and perhaps seriously misleading information is, according to reports furnished the FTC, $50,000 per corporation [22] or $17,250,000 for the first year. Five of the nine larger corporations surveyed by the Comptroller General estimated their costs with supporting methodology in excess of one million dollars each.[23]

19. The Court recognizes that while a possibility exists that the benefit of this decision may inure to the six additional plaintiffs who have filed in this district, the issue is not before the Court.

20. The quoted language is taken from the Report to the Comptroller General of the United States on the Evaluation of the Federal Trade Commission's Proposed Annual Line of Business Report (Form LB) p. 15. Complaint Exhibit Folder, Exhibit F. It does not constitute a definitive finding of fact by the Court at this stage in this proceeding.

21. " . . . On the one hand, individual business firms vary greatly in their organization, financial structure, and product lines. These variations are products of historical accident or the individual preferences of business leadership. To accurately reflect management, financial, and product-line structure of a specific business, therefore, the classifications and allocations must take account of these individualities.

"On the other hand, if information is to be collected from 500 firms and compared and aggregated, the data must be collected on the basis of definitions and specifications sufficiently uniform to make comparison and aggregation possible. Given the variations in business structure, uniform definitions will require most, if not all, responding businesses to report on a basis different than that on which they operate, with consequent impact on management practices and costs. . . . " Report to the Comptroller General of the United States on the Evaluation of the Federal Trade Commission's Proposed Annual Line of Business Report (Form LB) p. 5, Complaint Exhibit Folder, Exhibit F.

22. Docket 22, p. 143.

23. Note 21 *supra* at 10. Even assuming these figures are overstated, it is clear the

The Comptroller General also identified an FTC interest in learning from the initial, "unreliable" information, so that succeeding reports may be improved: "FTC regards this as a very significant benefit, worth the additional burden it imposes. Clearly, the early receipt of 1973 and 1974 reports would afford earlier opportunity for essential face-to-face meetings focused on resolution of problems." [24]

It is also clear that the provision of more accurate data in the future is in everyone's interest—the FTC, the business community, and the public (which, to the extent reporting expenses make business less profitable, suffers either through higher prices or lower tax income from affected companies). A delay in implementation of the LB Program which results in progress in the collective, joint, good-faith efforts of all parties to devise a less burdensome and more effective reporting system certainly would not be adverse to the public interest, even if it resulted in the LB Reports being available at a date later than anticipated. Given the holding *infra* that it is unlikely that plaintiffs' challenge to the FTC's power to implement the program will prevail, it is reasonable to assume that the parties' future efforts will be cooperatively directed toward improving the program's operation. In these circumstances, the public interest in efficiency outweighs any interest in speed.

### Probability of Success

■ Finally, the Court must determine whether, as to any ground urged by plaintiffs, there exists a "reasonable probability of eventual success in the litigation." Delaware River Port Authority, *supra*, 501 F.2d at 920.

Plaintiffs allege the LB Reports constitute an unreasonable search and seizure. Neither side addressed the point with any citations in briefs or at oral arguments. However, in view of cases such as Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 202–08, 66 S.Ct. 494, 90 L.Ed. 614 (1946), there appears at present to be no great likelihood of success on the merits of this claim.

Likewise, arguments based upon the Comptroller General's failure to follow the thrust of recommendations in his own report by rejecting the Commission's proposed program have no substantial probability of success. This applies as well to arguments based on the Commission's failure to resubmit the changed LB form to the Comptroller General for another review. There appears to have been strict compliance with the appropriate statutes, which plaintiffs themselves came very close to conceding if not in fact doing so.[25] In any event, this entire area of the Federal Reports Act and its amendment through Section 409 of P.L. 93–153 does not appear pregnant with possibilities for success on the merits.

Plaintiffs argue that the LB Report, with its burdensome effect on the resources of private business and the threat it poses to confidential secrets of those businesses, constitutes a taking of property without due process of law, in violation of the Fifth Amendment. Neither side referred to the point in brief or argument; accordingly, the Court cannot conclude that it constitutes a ground likely for success on the merits.

Plaintiffs ostensibly argue that the vague instructions in the LB form, as modified by subsequent communication with the Commission, coupled with the permission granted to use estimates and divergent existent records, conflict with the certification requirement as to truthfulness and accuracy of such data. It is believed the plaintiffs argue that the certification requirement carrying with it criminal sanctions renders the criminal statute unduly vague so as to be in violation of the Fifth Amendment.

---

costs of furnishing the requested information will be substantial.

24. Note 21 *supra* at 14–15.

25. Docket 22, pp. 124–26.

Without further elaboration by the plaintiffs, this Court declines to postulate further as to the outcome of such an argument in terms of likelihood of success.

## Undue Burden

By far, the overwhelming weight of plaintiffs' argument and evidence presented at the preliminary injunction hearing goes to the allegedly undue burden imposed upon them by the requirements in the Commission's order. The legal underpinning of this argument appears to be Federal Trade Commission v. Baltimore Grain Co., 284 F. 886 (D.Md. 1922), aff'd. per curiam, 267 U.S. 586, 45 S.Ct. 461, 69 L.Ed. 800 (1925), in which the District Court said that there must be "some reasonable proportion between the public value of the information likely to be obtained and the private annoyance and irritation it will occasion." Plaintiffs attempt to demonstrate the unduly burdensome nature of compliance vis-a-vis the extremely limited public value of the information being gathered.

The Court is of the opinion that the procedures the FTC followed have not been those which best serve the public interest, *infra*, pp. 1121–1125, and that collection of the best data possible is in the public interest. *Supra*, p. 1119. Nonetheless the Court doubts the propriety of its scouring the record in an effort to evaluate the probable value of the data sought. Courts have tended to limit their inquiry into investigative information requests to a determination only of the possible utility of the materials sought. *See, e. g.,* United States v. Feaster, 376 F.2d 147 (5th Cir. 1967).

Further, the vitality of the *Baltimore Grain* dictum has been, at the least, curtailed by United States v. Morton Salt, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950).[26]

In any event, if it were to engage in such a balancing process, the Court would require a record more fully developed than that now before it. On the basis of the current record, there is no reasonable likelihood that the LB Program would be shown to be unreasonably burdensome in light of its public value.

## Statutory Authority

Plaintiffs urge three separate contentions in support of their position on the merits that the Commission exceeded its statutory authority by adoption of the LB Program:

"a) Congress limited the Commission's Section 6 [15 U.S.C.A. § 46] powers to investigations in aid of substantive authority and rejected regulation by publicity

b) Section 6(b) [15 U.S.C.A. § 46(b)] reports are limited to production of information kept in ordinary course of business

c) Congress rejected a uniform system of reports and uniform accounting system which are contemplated by the LB Program." Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction—Contents.

A reading of 15 U.S.C.A. § 46(a)[27] effectively disposes of plaintiffs' primary contentions that investigation by the Commission is sanctioned only if made in conjunction with or related to an en-

26. It would appear the shift of judicial concern from substantive to procedural due process would direct the force of this argument to procedural requirements where agencies initiate programs of substantial and widespread effect. *See, e. g.,* discussion *infra*, pp. 1121–1125.

27. The Commission shall also have power—
(a) To gather and compile information concerning, and to investigate from time to

time the organization, business, conduct, practices, and management of any corporation engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships.

forcement proceeding. There is no limitation in Section 46(a) which limits its applicability to enforcement proceedings.

With respect to reports by corporations, 15 U.S.C.A. § 46(b) and United States v. Morton Salt, *supra,* effectively dispel plaintiffs' contentions. In *Morton Salt* plaintiffs argued that Section 6(b), 15 U.S.C.A. § 46(b), reports could be used only in support of information-gathering activities and not enforcement under Section 5. The Supreme Court stated:

> While we find a good deal which would warrant our concluding that § 6 was framed with the pre-existing antitrust laws in mind, and in the expectation that the information procured would be chiefly useful in reports to the President, the Congress, or the Attorney General, we find nothing that would deny its use for any purpose within the duties of the Commission, including a § 5 proceeding. 338 U.S. at 649, 70 S.Ct. at 367.

The above-quoted language leaves one with a conviction bordering upon certainty that the Supreme Court does not read 15 U.S.C.A. § 46 as limited in application to use in conjunction with enforcement activity.

Plaintiffs' contention with respect to publicity is effectively disposed of by reference to 15 U.S.C.A. § 46(f) which expressly empowers the Commission . . . "[t]o make public from time to time such portions of the information obtained by it hereunder, . . . as it shall deem expedient in the public interest; . . . "

Plaintiffs' assertion that 15 U.S.C.A. § 46(b) reports are limited to production of information kept in the ordinary course of business is contraindicated by the holding of *Morton Salt.*

Plaintiffs argument predicated upon Congressional rejection of proposals presently sought to be implemented by the LB Program, while ingenious, is nonetheless unconvincing.

All of the above coupled with the broad language of *Morton Salt* cause this Court to find there is no reasonable probability that plaintiffs will prevail on their contention that the Commission exceeded its statutory authority by reason of its adoption of the LB Program.

*Compliance With Section 4 of the Administrative Procedure Act*

There remains for discussion plaintiffs' contention that the Commission has violated the APA in promulgating the LB Program.

Section 4 of the Administrative Procedure Act, 5 U.S.C.A. § 553, establishes the procedure to be followed when an agency seeks to implement specified types of rules. In essence, it requires the originating agency to publish all proposed rules, with an invitation to interested parties to make written comments. After consideration of relevant matters presented, the agency formulates the final rule, incorporating therein a concise general statement of their basis and purpose. The final rules must be published or served, but do not become effective for thirty days thereafter, thus allowing comment to be made to the final version.[28] The described procedure was designed not only to permit the public to participate in the rulemaking process, but "[to enable] the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, 744 (3d Cir. 1969); *see also* NLRB v. Wyman-Gordon Co., 394 U.S. 759, 777–78, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (Douglas, J., dissenting); National Petroleum Refiners Ass'n v. FTC, 157 U.S.App.D.C. 83, 482 F.2d 672, 682 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L. Ed.2d 567 (1974).

---

28. Certain exceptions to this procedure are recognized by the APA; for purposes of the instant case, they are not applicable. *See* 5 U.S.C.A. § 553(b).

In the instant case, the Commission, on August 22, 1974, published in the Federal Register a summary description of the LB Program entitled "Resolution Requiring Annual Line of Business Reporting Program." The "resolution" was nowhere characterized as a proposed Commission rule, nor did it invite comments from the public. It does not appear that comments were, at that point, received or considered, that the resolution was subsequently republished or served as a final rule, or that thirty days elapsed between the date of publication and the effective date of the LB Program.[29]

Defendant has made no attempt to persuade the Court that the Commission complied with the rulemaking provisions of the APA. Rather, the government contends that these procedures are inapplicable to the promulgation and implementation of the LB Reporting Program because the Program is designed solely to gather information; the Program does not entail "an agency statement . . . designed to implement, interpret, or prescribe law or policy."[30] Implicit in this argument is the premise that agency investigation and rulemaking are mutually-exclusive functions and that investigatory activities conducted by an agency relieve it from the need to comply with the rule-making strictures of the APA. This Court disagrees.

■■■ Many federal and state agencies are possessed of broad investigatory and rulemaking powers. The investigatory grant of authority to the Commission is particularly far-reaching, authorizing, among other things, the power to investigate corporations, to require annual and special reports from corporations, and to investigate compliance with antitrust statutes and decrees. 15 U.S.C.A. § 46. However, it does not follow that because the Commission seeks disclosure of information under the broad authority granted by the Federal Trade Commission Act, it is relieved of the necessity to proceed in the manner prescribed by the APA when its action, whatever the Commission may label it, constitutes "rulemaking." Section 6(g) of the FTC Act, 15 U.S.C.A. § 46(g), provides:

The Commission shall also have power—

(g) From time to time to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of sections 41 to 46 and 47 to 58 of this title.

Congress specifically intended in Section 6(g) to authorize the promulgation and implementation of rules relating to the Commission's investigatory powers. National Petroleum Refiners Ass'n v. FTC, 340 F.Supp. 1343, 1348–49 (D.D.C. 1972), rev'd on other grounds, 157 U.S. App.D.C. 83, 482 F.2d 672 (1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).[31] *See also* FTC v. Scientific Living, Inc., 150 F.Supp. 495, 498–99 (M.D.Pa.1957), aff'd, 254 F.2d 598 (3d Cir.), cert. denied, 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958), reh. denied, 358 U.S. 867, 79 S.Ct. 98, 3 L. Ed.2d 99 (1958). In the latter case, the court stated:

Section 9 [of the FTC Act] specifically provides that the Commission . . . shall have access to any documentary evidence of any corporation *being investigated or proceeded against* (emphasis in original) . . . . *Having such power the Commission could make rules under § 6(g), Id. § 46(g) regulating the procedure in connection therewith.* (emphasis supplied).

---

29. Nothing in the record indicates that the FTC had previously published a notice of proposed rulemaking, thereby rendering the August 22, 1974 publication its final statement of a proposed rule.

30. Commission Brief p. 31; *see* 5 U.S.C.A. § 551(4).

31. In reversing, the Circuit Court of Appeals held that the rulemaking powers conferred by Section 6(g) encompassed not only rules relating to FTC procedure and investigation, but substantive trade regulations as well.

The investigatory and rule-making powers contemplated by the Federal Trade Commission Act are thus not mutually-exclusive, but complementary. The fact that the Commission's LB Program was instituted pursuant to its broad statutory powers of investigation does not *ipso facto* compel the conclusion that the LB Program could involve no elements of rulemaking. The Court must now determine whether rulemaking of the type contemplated by the Administrative Procedure Act did in fact occur.

Most commentators and courts have attempted to determine the earmarks of the rulemaking process by comparing it with the adjudicatory process. *See, e. g.*, K. Davis, Administrative Law Treatise § 5.01, at 285–90 (1958); Hoffman-LaRoche, Inc. v. Kleindienst, 478 F.2d 1, 13 (3d Cir. 1973). So juxtaposed, the salient characteristics of rulemaking appear to be two: (1) rules apply in an across-the-board manner to classes of persons, independent of special circumstances or equities peculiar to individuals within those classes; and (2) rules are primarily of prospective application. *See* Hoffman-LaRoche, Inc. v. Kleindienst, *supra* at 13.

Judged by these criteria, the FTC LB Program arguably possesses the earmarks of rulemaking. The reporting and recordkeeping requirements of the Program have generalized, across-the-board applicability to a large number of industrial concerns; moreover, the requirements are entirely prospective in effect, requiring compliance on or before specified future dates.

However, the utility of these traditional criteria in the case at bar is dubious because these criteria were developed in the context of cases seeking to distinguish rulemaking from the adjudicatory process. In the instant case, we are compelled to distinguish rulemaking from the purely investigatory process. The dubious value of the traditional indicia of rulemaking in this context is readily apparent when it is realized that many purely investigatory acts by an agency entail across-the-board orders affecting large classes of persons which are entirely prospective in effect.

This does not mean that the rulemaking and investigative functions are conceptually indistinct. An order directing the mere production of existing books and business records does not necessarily entail a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." Administrative Procedure Act § 2(c), 5 U.S.C.A. § 551(4). Where, however, in conjunction with its investigatory functions, an agency promulgates far-reaching directives which effectively prescribe the manner in which business records are to be kept for reporting purposes and which affect a substantial number of business enterprises, the agency has gone beyond a mere order to produce books and business records. In such a case, the agency has also prescribed law and/or policy.[32]

While the foregoing distinction is couched in terms of polar extremes, for purposes of the instant case, a narrower conceptual differentiation is not required. In implementing the LB Program, the FTC has directed businesses subject thereto not only to produce for inspection books and business records, but to compile and tabulate business data according to a complex classification system. Much of the data is not now maintained in the ordinary course of business and its value, in terms of the objectives of the LB Program, is uncertain. The effects of the program are pervasive, imposing new and unexpected liabilities of no small magnitude, yet the classification methods utilized by the

---

32. That agency statements affecting business accounting practices may be the subject of "rulemaking" is made apparent by the APA: "[R]ule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . and *includes the approval or prescription for the future of accounting, or practices bearing [thereon]*. 5 U.S.C.A. § 551(4) (emphasis supplied).

Program are relatively untested. Under the circumstances, it appears that the FTC has transcended its purely investigatory function.

Professor Davis has suggested that difficulties in classifying hybrid administrative functions should be resolved with due regard to the desirable or undesirable consequences which a given classification will produce. K. Davis, Administrative Law Treatise § 5.01, at 293 (1958). Given the probable impact of the LB Program on American industry, the fact that compliance with its accounting and reporting requirements will require no small expenditure of industry time and money, and the uncertain value of the accounting and reporting methods utilized, it would seem highly desirable to allow all affected parties to make known their constructive suggestions and views on improving the LB Program. Inasmuch as the rulemaking procedures established by the Administrative Procedure Act were designed to secure this salutary objective, it appears that implementation of the LB Program should be deemed an instance of agency rulemaking.

■■■ Upon the present record and for reasons previously discussed, it does not appear that the rulemaking procedures of the APA were adhered to in the implementation of the LB Program. The government has suggested substantial compliance with the APA procedure, alluding to the fact that the Office of Management and Budget as well as the General Accounting Office have solicited comments from interested parties concerning the LB Program and that further opportunity for comment was afforded in the context of motions to quash directed at the FTC compliance orders.

Preliminary research discloses no cases which recognize the sufficiency of "substantial compliance" for purposes of Section 4 of the APA. In any event, the Court cannot at this point conclude that the procedures utilized by the government constitute "substantial compliance." While it is true that the OMB and the GAO conducted extensive inquiries into the feasibility of the LB Program and received written and oral comments from many quarters, the Court doubts that these procedures are an adequate substitute for the procedures established under the APA. First, the proposals before the OMB in August 1973 were not in final form; indeed, the OMB had no opportunity to receive comments on two subsequent revisions of the Program which incorporated substantial changes.[33] Second, while the GAO did comprehensively review the later LB proposals, that agency was statutorily authorized to evaluate the Program solely in terms of its burdensomeness and the duplicative nature of its reporting requirements; the GAO was not charged with a determination of the advisability or necessity of the Program itself.[34]

The fact that affected businesses were allowed to file motions to quash the FTC compliance orders is also unpersuasive. At the time the motions were filed, the Program was a *fait accompli;* there is little reason to believe that the FTC would afford the same plenary consideration to plaintiffs' arguments that it might have if the Program were yet at the incipient rulemaking stage.

For the foregoing reasons, the Court does not at this juncture feel that the procedures urged by the government constitute an adequate substitute for the rulemaking procedures established by the Administrative Procedure Act. Accordingly, with respect to this limited issue, the Court concludes plaintiffs have established a sufficient probability of

33. The review of the OMB was transferred, in substantially modified form, to the Comptroller General, prior to the promulgation of subsequent LB proposals by the FTC. *See*

P.L. 93–153, 44 U.S.C.A. § 3512 (1975 Supp.), amending 44 U.S.C.A. § 3501 et seq.

34. *See* 44 U.S.C.A. § 3512 (1975 Supp.).

success on the merits to warrant issuance of a preliminary injunction.

## ORDER

It is ordered and adjudged that:

(1) Defendants, their agents, officers, servants, and employees, and all persons in active concert or participation with them are herewith enjoined and restrained during the pendency of this litigation and until further order of this Court from:

(a) Giving notice of default to plaintiffs for failure to file Form LB as required by the resolution of the Federal Trade Commission dated August 2, 1974, and its special orders entered pursuant thereto; and

(b) Enforcement of or causing to be enforced civil penalties and all other forms of judicial and administrative relief, including but not limited to mandamus, for plaintiffs' failure to file the aforesaid Form LB.

(2) Defendants' motion to dismiss plaintiffs' complaint for want of jurisdiction is herewith denied.