**GTE SYLVANIA INCORPORATED, Plaintiff,**

v.

**CONSUMER PRODUCT SAFETY COMMISSION et al., Defendants.***

**Civ. A. No. 75–104.**

United States District Court,
D. Delaware.

Oct. 23, 1975.

---

* Consolidated with,
RCA Corp., 75–108; Magnavox Co., 75–112; Zenith Radio Corp., 75–113; Motorola, Inc., 75–114; Warwick Electronics, Inc., 75–115; Aeronutronic Ford Corp., 75–116; Teledyne Mid-America Corp., 75–122; Admiral Corp., 75–131; General Electric Co., 75–136; Matsushita Electric Corp. of America, 75–150; Sharp Electronics Corp., 75–151; and *Toshiba America, Inc. v. Consumer Product Safety Commission*, 75–152.

Tunnell, Wilmington, Del., and Robert L. Palmer and Eugene C. Holloway of Covington & Burling, Washington, D. C., for plaintiffs GTE Sylvania Inc. and Aeronutronic Ford Corp. (C.A. No. 75–104 and C.A. No. 75–116).

Richard J. Abrams, of Richards, Layton & Finger, Wilmington, Del., and Stephen B. Clarkson, of Sullivan, Beauregard & Clarkson, Washington, D. C., for plaintiff The Magnavox Co. (C.A. No. 75–112).

Januar D. Bove, Jr. and Arthur G. Connolly, Jr., of Connolly, Bove & Lodge, Wilmington, Del., and Clark J. Gurney and Charles E. Matthews, Jr., of Spengler, Carlson, Gubar & Churchill, New York City, for plaintiff Zenith Radio Corp (C.A. No. 75–113).

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., and Walter T. Kuhlmey, of Kirkland & Ellis, and Joseph R. Haack, Chicago, Ill., for plaintiff Motorola, Inc. (C.A. No. 75–114).

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., and Irving Scher, of Weil, Gotshal & Manges, New York City, for plaintiff Matsushita Electric Corp. of America (C.A. No. 75–150).

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., and David Fleischer and John H. de Boisblanc of Battle, Fowler, Lidstone, Jaffin, Pierce & Kheel, New York, N. Y. for plaintiff Toshiba America, Inc. (C. A. No. 75–152).

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., and Reuben L. Hedlund, of Kirkland & Ellis, Chicago Ill., for plaintiff Teledyne Mid-America Corp. (C.A. No. 75–122).

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del., and Peter A. Dankin and Peter J. Gartland, of Wender, Murase & White, New York City, for plaintiff Sharp Electronics Corp. (C.A. No. 75–151).

Clair John Killoran and Andrew G. T. Moore, 2nd, of Killoran & Van Brunt,

James M. Tunnell, Jr., and William H. Sudell, Jr., of Morris, Nichols, Arsht &

Wilmington, Del., and Charles C. Hileman, III, and Ira P. Tiger, of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiff RCA Corp (C.A. No. 75–108).

Howard M. Berg, of Berg, Komissaroff & Sawyer, Wilmington, Del., and Michael A. Stiegel, of Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., for plaintiff Warwick Electronics, Inc. (C. A. No. 75–115).

Henry N. Herndon, Jr., Morris L. Stoltz, II, and Edward M. McNally of Morris, James Hitchens & Williams, Wilmington, Del., and H. Woodruff Turner, of Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for plaintiff Admiral Corp. (C.A. No. 75–131).

H. James Conaway, Jr., Ben T. Castle and Frederick W. Iobst of Young, Conaway, Stargatt & Taylor, Wilmington, Del., and Robert W. Steele, William E. Wickens, Harold D. Rhynedance, Jr., and Alan M. Grimaldi of Howrey & Simon, Washington, D. C., for plaintiff General Electric Co. (C.A. No. 75–136).

W. Laird Stabler, Jr., U. S. Atty., Wilmington, Del., Rex E. Lee, Asst. Atty. Gen., Harland F. Leathers, Jeffrey Axelrad and Barry M. Katz, Attys., Department of Justice, Washington, D. C., and Maryanne Kane and Edward J. Cull, Attys., Consumer Product Safety Commission, Washington, D. C., for defendants.

## OPINION

LATCHUM, Chief Judge.

In these thirteen separate actions, each plaintiff, a manufacturer of televi-sion receivers, seeks a preliminary injunction restraining the Consumer Product Safety Commission ("Commission"), its members and officers from disseminating certain information to the public which the plaintiffs contend is privileged, confidential, misleading and inaccurate.

Congress, in 1972, enacted the Consumer Product Safety Act (the "Act"), 15 U.S.C. § 2051 et seq., in order to "establish comprehensive and effective regulation over the safety of unreasonably hazardous consumer products."[1] To implement and administer this legislative policy, the Act established the Commission as an independent regulatory agency. Shortly after its creation, the Commission became concerned about the safety of television sets. During the spring and summer of 1974, the Commission sought and obtained television-related accident data from television manufacturers in three ways: by a general public request for information, by a special order pursuant to 15 U.S.C. § 2076(b)(1), and finally by the issuance of subpoenas duces tecum pursuant to 15 U.S.C. § 2076(b)(3). Upon receipt of such information, the data was consolidated and a computer printout was prepared which listed the alleged accidents separately. On March 28, 1975, the Commission decided to release to the public the bulk of the television-related accident material in its possession which it had gathered from the plaintiffs.

Subsequently, each of the thirteen plaintiffs brought a suit against the Commission[2] for an injunction prohibiting the public dissemination of the in-

1. H.R.Rep.No.1153, 92d Cong., 2d Sess. 26 (1972). The purposes of the Act are:
"(1) to protect the public against unreasonable risks of injury associated with consumer products;
(2) to assist consumers in evaluating the comparative safety of consumer products;
(3) to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations; and
(4) to promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries." 15 U.S.C. § 2051(b).

2. In addition to the Commission, the following members, officers and employees were named as defendants: Richard O. Simpson, Chairman, Constance B. Newman, Vice Chairman, R. David Pittle, Lawrence M. Kushner, Barbara Hackman Franklin, Commissioners, Sadye E. Dunn, Secretary, and Vince DeLuise, Freedom of Information Officer. They will be referred to collectively as the "Commission" or "defendants."

formation obtained from each on the ground that such information was privileged, confidential, misleading and inaccurate. The thirteen actions were consolidated[3] for a hearing on plaintiffs' motions for preliminary injunctive relief. The defendants also consented to the entry of a temporary restraining order[4] prohibiting the public disclosure pending the Court's decision on plaintiffs' present motions.[5]

## I. BACKGROUND

In March 1974, the Commission issued a public notice[6] announcing that it would hold a public hearing to investigate the hazards encountered during the operation of television receivers and to consider the necessity of developing safety standards for such receivers. By this notice, the Commission sought certain technical information and TV-related accident data from manufacturers of television sets and the component parts thereof. The notice described the accident data sought in part as follows:

"Although the hearing is intended to emphasize fires and shocks related to TV sets, information pertaining to all aspects of TV set safety may be submitted (with the exception of radiation hazards . . .).

3. Docket Item 10 (C.A. No. 75–104).

4. Docket Item 3 (C.A. No. 75–104). The temporary restraining order was later modified to permit release of the gathered information to four employees of Underwriters Laboratories, Inc., which had been retained by the Commission to develop safety standards for television receivers. In addition the data without identification of manufacturer, model or chassis number was authorized to be released to Underwriters Laboratories, Inc. and other individuals involved in developing the safety standards. Docket Item 34 (C.A. No. 75–104).

5. Defendants also moved for summary judgment in each case (Docket Item 35, C.A. No. 75–104), but these motions are not presently before the Court. (Docket Item 42, p. 3, C.A. No. 75–104).

6. 39 Fed.Reg. 10929 (March 22, 1974).

\* \* \* \* \* \*

. . . In particular, each TV manufacturer is requested to submit all accident reports collected since the 1969 hearings held by the National Commission on Product Safety. If present data recording procedures differ from the method proposed in the 1969 'Electronic Industry Ad Hoc Engineering Report on Television Fires' which was submitted to the National Commission on Product Safety, place (sic) indicate the procedures used."[7]

Although a few manufacturers complied with the Commission's general request for data, their principal response consisted of a six page summary of accident data supplied by the Electronics Industry Association ("EIA").[8]

After reviewing the data voluntarily submitted, the Commission concluded that "the information submitted to the Commission by the EIA on behalf of the [Companies did] not satisfy the Commission's request."[9] Thus on May 13, 1974, the Commission, acting pursuant to 15 U.S.C. § 2076(b)(1),[10] sent special orders to twenty-five manufacturers of television receivers and components.[11] The information sought by these special orders was broken down into six categories: (1) TV-related accident data, (2)

7. *Id.* 10930.

8. Par. 5 Affidavit of Constance B. Newman, Vice Chairman of the Commission ("Newman Aff'd") Docket Item 27, C.A. No. 75–112.

9. *E. g.*, Special Order of Commission to General Electric Company. Docket Item 11A, Ex. A–1, C.A. No. 75–136.

10. 15 U.S.C. § 2076(b)(1) provides: "The Commission shall have the power—(1) to require, by special or general orders, any person to submit in writing such reports and answers to questions as the Commission may prescribe; and such submission shall be made within such reasonable period and under oath or otherwise as the Commission may determine."

11. Of the plaintiffs here, only RCA did not receive a special order. Newman Aff'd, par. 6.

Current, future-planned and suggested TV-related safety standards, (3) Quality control and quality assurance plans, (4) Service technicians, (5) Improvement plans for presently used sets, and (6) Specific technical areas.[12]

The instructions for the TV-related accident data category provided:

"You are requested to submit all accident reports collected since the 1969 hearings held by the National Commission on Product Safety. If present data recording procedures differ from the method proposed in 1969 'Electronics Industry Ad Hoc Engineering Report on Television Fires' which was submitted to the National Commission on Product Safety, please indicate the procedures used." [13]

In the cover letter [14] accompanying the special orders, the Commission "[recognized] that some of the information to be submitted [might] be proprietary" and referred the manufacturer to certain statutory provisions [15] designed to protect confidential information supplied to the government. The Commission encouraged compliance by stating in the cover letter:

"This information will be received in confidence. It will not be placed in a public file and will not initially be made available to the public."

However, the possibility of a request for public access to this information by way of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, was noted, and the manufacturers were instructed to identify data claimed to be exempt from public disclosure and to "substantiate" any such claims. Claims of confidentiality accompanied the response of most manufacturers.[16]

Again, the Commission was not satisfied with the data supplied by the manufacturers pursuant to the special orders and the companies were notified as follows:

"The Commission has reviewed your response to its May 13, 1974, Special Order requesting information on TV-related fire and shock hazards. Although we recognize your effort to comply with the terms of the Special Order, technical analysis shows that your response fails to provide sufficient information with respect to certain questions enumerated in the Order.

Accordingly, the Commission has decided to issue the attached subpoena, pursuant to section 27(b)(3) of the Consumer Product Safety Act [15 U.S.C. § 2076(b)(3)] which specifies the additional information required.

It should be noted that failure to respond to the subpoena within the time specified therein may, pursuant to section 27(c) of the Act [15 U.S.C. § 2076(c)] lead to entry of a court order against you directing compliance with the Commission's subpoena." [17]

Thus, on July 26, 1974 subpoenas duces tecum were issued to the plaintiffs and three other TV manufacturers [18] re-

12. *E. g.*, Special Order of Commission to General Electric Company. Docket Item 11A, Ex. A–1, C.A. No. 75–136.

13. *Id.*

14. *E. g.*, Letter of Richard O. Simpson, Chairman of the Commission, to General Electric Company, May 13, 1974. (Docket Item 11A, Ex. A–1, C.A. No. 75–136).

15. 15 U.S.C. § 2055(a)(1), 5 U.S.C. § 552(b)(4) & (7), 15 U.S.C. § 2055(a)(2), and 18 U.S.C. § 1905.

16. *E. g.*, Letter of H. C. Burgess, General Electric Co., to Richard O. Simpson, Chair-

man of the Commission, May 29, 1974. Docket Item 11A, Ex. A–2, C.A. No. 75–136.

17. *E. g.*, Letter of Sadye E. Dunn, Secretary of the Commission, to H. B. Walden, General Electric Co., July 26, 1974 (Docket Item 11A, Ex. A–3, C.A. No. 75–136).

18. Sony Corp., Sanyo Electric, Inc., and Wells-Gardner Electronics Corp. were subpoenaed but did not seek to bar public disclosure of data which they forwarded to the Commission. Newman Aff'd, par. 8. Apparently, the Commission did not order all manufacturers of TV sets sold in this country to submit accident reports. Deposition

quiring the production of certain technical information and all television-related accident data [19] as follows:

"All TV-related accident reports collected since the 1969 hearings held by the National Commission on Product Safety. The term 'reports', includes, but is not limited to, all physical forms of: correspondence, letters; telegrams; cables; tapes; recordings; photographs; films; memoranda, including writeups of telephone calls and other oral communications; press releases, bulletins; newspaper, magazine or other journalistic articles; diaries; charts; contracts; agreements; and any other writing prepared by any person or persons, including those by insurance firms, investigators, laboratories and researchers; and includes both originals and copies whether or not sent or received. The term 'reports' includes those reports maintained on a form (sample attached) designed by members of the Electronics Industries Association (EIA) and submitted to the National Commission on Product Safety in November 1969 and also those reports maintained on any and all forms sub-stituted for the attached sample EIA form." [20]

Standards of reliability and accuracy for the data sought were indicated on sample data forms accompanying the subpoenas.

"The purported information in this form is based upon such reports as are available but in many cases will be incomplete, unverified and even incorrect." [21]

The Commission sought unverified information intentionally because it wanted to obtain as large a data base as possible.[22] Again, accident reports supplied in compliance with the subpoena duces tecum were accompanied by claims of confidentiality.[23] However, the Commission did not mention the issue of confidentiality in either the subpoena or the cover letter.

In order to reduce the information contained on the approximately 120,000 pieces of paper received in response to the subpoenas duces tecum to a mangeable form, the Commission retained Tracor-Jitco, Inc. ("Tracor") to extract and categorize the data contained in the accident reports.[24] This consolidation of in-

of Robert L. Northedge ("Northedge Dep.") p. 78. Northedge, an electrical engineer, employed by the Bureau of Engineering Science of the Commission was project manager of the Commission's investigation of television hazards.

19. *E. g.*, subpoena duces tecum addressed to H. B. Walden, General Electric Co., July 26, 1974 (Docket Item 11A, Ex. A–3, C.A. No. 75–136). Prior to serving the subpoenas the Commission had been warned of the confusion that might result from the problem of defining a TV-related accident. Letter of A. E. Allen, Philco-Ford Corp. to the Commission, May 28, 1974 appended to Joint Memorandum of GTE Sylvania and Aeronutronic Ford Corp. in support of motion for preliminary injunction. (Docket Item 24, C.A. No. 75–104). Evidently, there is no standard definition of TV-related accidents. Northedge Dep. pp. 29–32. Moreover, the brief preface of the subpoenas referred to the Commission's "investigation of shock and fire hazards associated with television re-ceivers," but the body of the subpoenas designated "[a]ll TV-related accident reports."

20. The description of TV-related accident data was identical for each subpoena. On the other hand, the technical information requested did vary slightly from manufacturer to manufacturer, but, generally, it corresponded to the materials sought in the May 13, 1974 special order. (Newman Aff'd, par. 9.)

21. Docket Item 35, C.A. No. 75–104.

22. Northedge Dep. pp. 169, 200, 258.

23. Newman Aff'd, par. 10; *E. g.*, Letter of F. R. Wellner, General Electric Co., to Sayde E. Dunn, Secretary of the Commission, October 22, 1974 (Docket Item 11A, Ex. A–4, C.A. No. 74–136).

24. Newman Aff'd, pars. 10, 15.

formation was designed to assist the organization engaged in developing safety standards and also to make the accident data more meaningful to members of the public who might inspect it under the Freedom of Information Act.[25] Data summary sheets were prepared by gleaning from accident reports the appropriate responses for the several categories.[26] Although many reports did not contain enough data to answer each question,[27] the Commission was seeking as much information in manageable form as possible.

Tracor was responsible for transferring information from the accident reports to the data summary sheets from which the computer cards could be keypunched. In order to ensure that Tracor's employees performed the tasks accurately, Tracor's supervisor initially reviewed every sheet and later performed random checks by comparing the extracted data against the original report. Also, Robert A. Yereance, a consultant retained by the Commission, screened the same sheets that the Tracor supervisor examined. Finally, Robert L. Northedge, the Commission project manager, reviewed some of the abstracts.[28]

Then, the information on the data summary sheets was keypunched by another organization under contract with the Commission and was read into a Commission computer program which produced a printout of the information previously coded.[29] The printout was reviewed but only about fifty individual accident reports were checked against their summaries on the computer printout.[30]

At this point, there were 10,765 separate line items;[31] each line item represented a separate report. Tracor next undertook a duplication search. The duplication search was carried out by selecting a particular category of information and grouping the reports according to a common parameter within that category. For example, the accidents reported were grouped by the states in which they occurred; they were also grouped alphabetically by the initials of the victim; listing model numbers consecutively constituted another method. After grouping, summaries exhibiting the same classifying parameters were inspected for other similarities. When the comparison indicated that the reports might be related, the original accident reports were examined.[32] As a result of this endeavor, separate reports of the same incident were consolidated and exact duplicates were eliminated. This winnowing procedure reduced the number of accident reports to 7,620.[33]

25. Northedge Dep. pp. 24–25; Memorandum of Robert L. Northedge to Enid Rubenstein of the Commission, December 3, 1974 (Docket Item 11A, Ex. B, C.A. No. 75–136).

26. A memorandum from Edward J. Cull, Office of General Counsel, to the Commissioners ("Cull Memorandum") 2, March 21, 1975 (Docket Item 11A, Ex. A–7, C.A. No. 75–136) lists twenty-five categories of extracted information: (1) file number assigned to the accident, (2) manufacturer, (3) model numbers, (4) chassis number, (5) TV type (color or black and white), (6) chassis type, (7) switch type, (8) model type, (9) cabinet material, (10) year of manufacture, (11) owner's initials, (12) failed part, (13) location of failed part in set, (14) prior indication of trouble, (15) repaired prior to accident, (16) electric power status, (17) time in electric power status, (18) type of accident, (19) time of day, (20) state, (21) location,

(22) number of injuries, (23) number of fatalities, (24) damage and (25) amount and type of claims. The Newman affidavit indicates that there were twenty-seven categories of information. Newman Aff'd, par. 15(a).

27. Northedge Dep. pp. 190–94.

28. Id. pp. 216–20. It was not considered necessary to review every data sheet. Id. p. 219.

29. At least 99 percent of the accident reports summarized on the computer printout were obtained through the subpoenas duces tecum. Id. p. 247.

30. Id. p. 112.

31. Id. p. 221.

32. Id. pp. 223–225.

33. Newman Aff'd, par. 17.

Tracor also classified as confidential the identity of the victim and any documents encompassed by the work product doctrine and the attorney-client privilege.[34] This information, therefore, has been excluded from the filed accident reports and computer printout.[35]

A Commission consultant, Robert A. Yereance, prepared a report captioned "Analysis of TV Accident Data"[36] ("Yereance Report"), the purpose of which was stated to be as follows:

"To assist in the processing of the TV-related accident data and to analyze and summarize the data following completion of the data processing, the Commission hired a consultant, Robert A. Yereance. Mr. Yereance has prepared for the benefit of the offeror which has been selected to develop a TV standard, a report entitled, 'Analysis of TV Accident Data.' This report, which is based upon the accident data submitted to the Commission by the manufacturers, analyzes that data in terms of the number of television sets in use in the United States and the relative incidence of television-related accidents. The report does not identify a particular manufacturer, TV model, or chassis; it contains only industry-wide statistics. The purposes of this report were to answer basic questions concerning TV-related hazards, to provide a picture of the magnitude or relative significance of hazards that exist in TV sets currently in use, and to point out information which should prove valuable in the development of a standard to reduce hazards."[37]

The requirement that manufacturers submit reports of dubious validity apparently reflected the Commission's concern that limiting the subpoenas to only verified reports would result in a data base which would be too small for proper analysis.[38] Also, it was thought that trends indicating design inadequacies of a particular manufacturer might appear.[39] However, the Commission never attempted to distinguish the verified reports from the unverified reports.[40] Indeed of the more than 7,600 tabulated reports, the Commission investigated less than 100 of them.[41]

Furthermore, the confusion generated by the lack of a clear definition of "TV-related accident"[42] is aptly reflected in the following dialogue between counsel for RCA and the Commission's project manager, Robert L. Northedge:

"Q. [By Mr. Tiger] Mere speculation is enough to characterize it as a TV-related accident?

A. [By Mr. Northedge] For the purposes for which we subpoenaed this information, yes.

Q. Is it proper to characterize as a TV-related accident the situation where someone is watching television while smoking a cigarette and the lit cigarette falls in the cushioning of a chair and starts a fire?

(Whereupon, the reporter read the pending question.)

THE WITNESS: I wouldn't think that would be proper.

Q. [By Mr. Tiger] What if, during the fire, the TV caught on fire?

34. *Id.* par. 15(c).

35. *Id.* par. 17.

36. Docket Item 41, C.A. No. 75–104. The temporary restraining order initially covered the Yereance Report. See note 4, *supra.* However, subsequent modification of that order (Docket Item 34, C.A. No. 75–104) provided that the Yereance Report, absent objection from plaintiffs, could be forwarded to Underwriters Laboratories, Inc. and those individuals assisting that organization in the development of safety standards.

37. Newman Aff'd, par. 18.

38. *Id.* par. 9; Northedge Dep. pp. 169, 200, 258.

39. Northedge Dep. pp. 242–43.

40. *Id.* p. 262.

41. *Id.* p. 43.

42. See note 19 *supra.*

A. [By Mr. Northedge] It would be classified as a TV-related accident.

Q. Is it proper to characterize as a TV-related accident the situation where a fire results from defective wiring in the house and the point of origin of the fire happens to be in the area of the television set?

A. Yes, because it is possible that the TV could have—we don't know, but it is possible that the TV could have caused the short circuit in the wall outlet.

Q. What if the TV didn't cause the short circuit in the wall outlet, it was caused by something else?

A. Well, in many cases we don't know this so it is entered as a TV-related fire.

Q. Is it proper to characterize as a TV-related accident, the stiuation where a burning candle sitting on top of a television set melts the cabinet?

A. Yes." [43]

Thus, it appears that an accident which would have been "TV-related" in one view could feasibly be perceived by another as not being "TV-related." That the Commission was well aware of the confusion and its consequences is clearly reflected in an internal memorandum which reads in part:

"It should be noted that some manufacturers appear to have submitted accident reports pertaining to fire and shock incidents only. Whereas, other manufacturers have submitted incident reports on TV tube implosions, carrying handle failures; (sic) instability of TV stands, etc., as well as incident reports on fire and shock." [44]

Moreover, although some manufacturers did not comply fully with the subpoena, the Commission never made any effort to compel the appropriate response [45] because it had made "a technical judgment that sufficient information [had] been collectively submitted by the sixteen manufacturers to significantly facilitate the Commission's regulatory development activities for TV receivers." [46]

Finally, the Commission's disclaimer accompanying the release to the public of the data submitted by manufacturers who are not parties to these actions focused on another critical source of inaccuracy:

"The television accident statistics being released to you may be misleading because some television manufacturers were more conscientious then (sic) others in maintaining television accident files." [47]

Notwithstanding this melange of inaccuracies, the Commission reached a final decision on March 28, 1975 [48] to release

43. Northedge Dep. pp. 120–21. The following would also be classified as "TV-related accidents": cutting a finger on a screw protruding from a TV cabinet, id. p. 35; sustaining a hernia while carrying a TV set, id. pp. 35, 116; fire caused by a candle that had been placed on top of a TV cabinet, id. pp. 172–73.

44. Bureau of Engineering Sciences of the Commission, "Report on Subpoena Compliance," Dec. 3, 1974 (Docket Item 11A, Ex. B, C.A. No. 75–136).

45. Northedge Dep. pp. 259–61.

46. Memorandum of Robert L. Northedge to Enid Rubenstein of the Commission, December 3, 1974 (Docket Item 11A, Ex. B, C.A. No. 75–136).

47. Newman Aff'd, par. 28. "It is recognized that some television manufacturers have ap-

parently been more conscientious in compiling accident data than others and thus, the release of the accident data might be misleading in some cases, i. e., a higher accident rate for one particular TV model than similar models because more complete records were maintained." Cull Memorandum, p. 7.

48. Newman Aff'd, par. 19. The Commission on August 21, 1974 apparently had promised the plaintiffs that the Secretary would first make an initial determination of the disclosure issues and that the Secretary's decision could be appealed to the Commission. E. g., Letter of Sadye E. Dunn, Secretary of the Commission to H. B. Walden, General Electric Co., August 2, 1974 (Docket Item 11A, Ex. A–5, C.A. No. 75–136). Despite this promise, the decision on disclosure was made by the Commission initially and the possibility of an appeal was foreclosed. See Cull

to the public the TV-related accident data and the computer printout compiled from the information obtained from the plaintiffs.[49] In deciding to release this information to the public, the Commission relied[50] upon a memorandum[51] prepared by its Office of General Counsel. The reasons for the disclosure are not clearly and explicitly set forth in this memorandum. However, it does state, "The release of the accident data would assist consumers to better evaluate the safety of TVs."[52] No other affirmative reason in support of disclosure was offered.[53]

In her affidavit of June 27, 1975 submitted during the course of this litigation, the Commission's Vice Chairman also asserted that "disclosure of the information would serve the important purpose of informing the public that hazards may exist in operating televi-sion receivers," and "would provide consumers with an indication of the kinds of questions that they should consider when purchasing a television set" and "that the large data base of TV-related accidents that [the Commission] had compiled would be useful to other parties interested in investigating the potential hazards associated with television receivers."[54]

On the other hand, the numerous sources of inaccuracy compelled the Commission's consultant, Robert A. Yereance, to disagree with the Commission's decision to disclose the data. According to Northedge, "he didn't feel that much of it should be released at all."[55] Furthermore, even Northedge concluded that the public could not meaningfully utilize the data as a valid basis for comparing the safety of the various manufacturers' televisions.[56] In sum, it

Memorandum, p. 4. Thus, no hearing was held on the claims asserted by the plaintiffs. Furthermore, the letter notifying the plaintiffs of the Commission's decision to release the accident data provided only for a minimum of ten days before disclosure. *E. g.,* Letter of Vince DeLuise, Freedom of Information Director of the Commission to Merle W. Kremer, GTE Sylvania Inc., April 8, 1975 (Docket Item 35, C.A. No. 75–104). Telegrams from the Commission eventually fixed May 1, 1975 as the proposed date of disclosure. (Docket Item 11A, Exs. A–8, A–9, C.A. No. 75–136).

49. These materials will be referred to as "information" or "accident data." The Commission evidently does not intend to release the technical information that it obtained from the plaintiffs. Newman Aff'd, par. 20; Docket Item 42, p. 53, C.A. No. 75–104. After the decision to disclose was reached by the Commission, the Yereance Report was prepared.

50. Newman Aff'd, par. 19.

51. Cull Memorandum. A copy of this memorandum is included in what the Commission terms its administrative record in each case. *E. g.,* Docket Item 35, C.A. No. 75–104.

52. *Id.* p. 5. Also the Commission's letter informing the plaintiffs of its disclosure decision mentioned "public health and safety" as a reason for disclosure. *E. g.,* Letter of DeLuise, Freedom of Information Director of the Commission to Merle W. Kremer,

GTE Sylvania, Inc., April 8, 1975 (Docket Item 35, C.A. No. 75–104).

53. The bulk of the memorandum purports to establish that the Commission can release the data to the public under the Freedom of Information Act, 5 U.S.C. § 552. The impact of the Freedom of Information Act on the present actions will be discussed later in this opinion. See notes 73–76 and accompanying text, *infra.*

54. Newman Aff'd, par. 29. The propriety of considering these justifications raised initially in these proceedings is considered later. See notes 64 and 71 and accompanying text *infra.*

55. Northedge Dep. p. 146.

56. *Id.* pp. 179, 256. This point was conceded by the defendants at oral argument (Docket Item 42, p. 74, C.A. No. 75–104). Northedge's final comments at his oral deposition clearly show that he, as project manager, could discern no benefit to the public of such disclosures. For example (Northedge Dep. pp. 276–277) :

"Q. [By Mr. Palmer] Well, you have previously testified that the data is not meaningful as a basis for consumers to make comparative safety assessments among the different manufacturers. What purpose is served by the release of the identity of particular manufacturers other than to facilitate such a concededly invalid comparison?

A. [By Mr. Northedge] I don't know what purpose there would be.

is apparent that the information obtained from the plaintiffs which the Commission proposes to release would be misleading to the consumer who attempted to use it for evaluating the relative safety of TV receivers manufactured by the plaintiffs.

## II. PLAINTIFFS' CONTENTIONS

The manufacturers have made numerous arguments in support of their contentions that disclosure of this information would be improper and that issuance of a preliminary injunction prohibiting disclosure would be appropriate.[57]

First, the plaintiffs assert that release of the information is prohibited by 15 U.S.C. § 2055(a)(2) which provides that information obtained by the Commission which "relates to a trade secret or other matter referred to in section 1905 of Title 18 shall be considered confidential and shall not be disclosed." The accident reports are viewed as being within a protected category.

Second, the Freedom of Information Act, 5 U.S.C. § 552, and 15 U.S.C. § 2055(a)(1) which refers to the FOIA are perceived as conferring upon the plaintiffs an affirmative right to. block public release of the information.

Third, the Commission is charged with having violated 15 U.S.C. § 2055(b)(1) which in part requires the Commission to "take reasonable steps to assure, prior to its public disclosure thereof, that information from which the identity of such manufacturer or private labeler may be readily ascer-

tained is accurate, and that such disclosure is fair in the circumstances and reasonably related to effectuating the purposes of [the Act]."

Fourth, the manufacturers challenge the procedure followed by the Commission in deciding to release the data. The Commission is said to have failed to promulgate rules to accommodate its information dissemination functions as required by FOIA, 5 U.S.C. § 552(a)(1), and to have failed to provide notice thirty days prior to public disclosure of the information and to supply a summary of the information destined for disclosure as mandated by 15 U.S.C. § 2055(b)(1), and to have failed to comply with an earlier promise of an administrative appeal.

Fifth, the plaintiffs maintain that the Commission is estopped from disclosing the information because of the Commission's representation to the manufacturers that the material obtained would not be made public.

Finally, an accusation of having violated the Due Process Clause of the Fifth Amendment is brought against the Commission. This constitutional argument is founded upon both alleged procedural deficiencies and the arbitrary nature of the Commission's decision to make public the previously confidential information.

## III. JURISDICTION AND SCOPE OF REVIEW

Although the plaintiffs have pleaded several jurisdictional grounds,[58]

Q. In other words, you can't think of any purpose that would be served by that?
A. Offhand, I cannot think of any purpose."
The Commission has offered plaintiffs the opportunity to come forward with information that would "substantiate" their claims of inaccuracy or duplication. Aff'd of Sheldon D. Butts, Assistant Secretary of the Commission, par. 2 (Docket Item 35, C.A. No. 75–104) ; Newman Aff'd, par. 27.

57. Although the manufacturers individually have raised different issues and stressed dif-

ferent arguments, their contentions are considered collectively. Also, while raising the same general issue individual plaintiffs may have emphasized uniquely perceived nuances. Therefore, even though the principal arguments are indicated, the list should not be viewed as an all inclusive catalogue.

58. Among the asserted bases for jurisdiction are 28 U.S.C. §§ 1331, 1332, 1346, 1361, 2201–02 and 5 U.S.C. §§ 702, 704. While some plaintiffs failed to mention the source of jurisdiction upon which the Court relies, it is nevertheless appropriate for the Court

the Court finds that it has jurisdiction of this matter by virtue of 28 U.S.C. § 1337, which provides:

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ."

First, the general purpose of the Act to protect individuals who use consumer goods suggests a Congressional intention to regulate commerce.[59] Second, and more importantly, the regulation of commerce aspect of this legislation was explicitly set forth in 15 U.S.C. § 2051(a)(6).

"The Congress finds that—

\* \* \* \* \* \*

regulation of consumer products the distribution or use of which affects interstate or foreign commerce is necessary to carry out this chapter."

Thus, it is clear that the Act can be included under the umbrella of § 1337.[60] Furthermore, § 1337 constitutes an appropriate basis for the review of an administrative determination. *Davis v. Romney*, 490 F.2d 1360 (C.A. 3, 1974); *General Motors Corp. v. Volpe*, 457 F.2d 922 (C.A. 3, 1972), *aff'g* 321 F.Supp. 1112 (D.Del.1970).

■ Closely akin to the issue of jurisdiction is the question of plaintiffs' standing to seek the requested relief.[61] First, adverse publicity and harm to commercial reputation which would like-

ly result from the proposed disclosure would amount to "injury in fact." Second, the requirements of 15 U.S.C. § 2055(b)(1) that the Commission take reasonable steps to assure accuracy and that disclosure be fair in the circumstances reflect a concern for the impact that inaccuracies and misleading public releases might have on manufacturers whose products were being investigated by the Commission. Thus, the interests which the plaintiffs seek to preserve are "arguably within the zone of interests to be protected" by 15 U.S.C. § 2055(b)(1). *Data Processing Service v. Camp*, 397 U.S. 150, 151–154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Merriam v. Kunzig*, 476 F.2d 1233 (C.A. 3, 1973), *cert. den. sub nom. Gateway Center Corp. v. Merriam*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149.

■ Judicial review of administrative actions, of course, is governed by the Administrative Procedure Act, specifically 5 U.S.C. §§ 701–706.[62] It is clear "that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). No statute prohibits review of Commission action, and nothing has been found to suggest that Congress intended to confer upon the Commission unreviewable discretion as defined

---

to recognize the applicability of § 1337 to those plaintiffs' claims. *Cf. Sun Printing & Publishing Ass'n v. Edwards*, 194 U.S. 377, 24 S.Ct. 696, 48 L.Ed. 1027 (1904).

59. *See, e. g.*, S.Rep.No.835, 92d Cong., 2d Sess. 7 (1972); H.R.Rep.No.1153, 92d Cong., 2d Sess. 21–24, 26–27 (1972), U.S.Code Cong. & Admin.News 1972, p. 4573.

60. It should also be noted that when the Act was codified in the United States Code, it was placed in Title 15, which deals with trade and commerce.

61. See also 5 U.S.C. § 702 (Administrative Procedure Act) which provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

62. 5 U.S.C. § 701(a) provides:
"This chapter applies, according to the provisions thereof, except to the extent that—
(1) statutes preclude judicial review; or
(2) agency action is committed to agency discretion by law."
5 U.S.C. § 704 provides in part:
"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."

in 5 U.S.C. § 701(a)(2), a provision which has been given a very narrow interpretation. *E. g., Adams v. Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973). Because the Commission plans no further proceedings before releasing the data, the finality requirement has also been satisfied.

Although plaintiffs are requesting a preliminary injunction, this action, nevertheless, amounts to a review of an administrative determination, and while the heavey burden imposed on a party seeking a preliminary injunction must be met fully, it is still necessary to define with some precision the scope of review open to this Court.

 The appropriate scope of review of the Commission's decision to disclose the accident data is defined in 5 U.S.C. § 706(2)(A):

"The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be— ·

(A) arbitrary, capricious, an abuse of discetion, or otherise not in accordance with law."

Thus, the Court can prevent disclosure of accident data only if the Commission's actions fall beyond the permissible discretionary range defined by the "arbitrary and capricious" standard. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 413–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *A. O. Smith v. FTC,* 403 F. Supp. 1000 (D.Del., filed September 22, 1975).[63] In *Overton Park, supra,* at 416, 91 S.Ct. 814, 823, district courts

were instructed that in applying the "arbitrary and capricious" standard, they "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Furthermore, "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* See *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Therefore, although the Court must review the events below with great care, the plaintiffs, nevertheless, must make a clear and convincing showing that the Commission erred and exceeded the bounds of its discretion in deciding to release the accident data.

 Also, it is necessary to determine what materials may be considered in reviewing the Commission's actions. "In applying [the 'arbitrary and capricious'] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts, supra* 411 U.S. at 142, 93 S.Ct. at 1244. This language, the Commission contends,[64] precludes consideration of the Northedge Deposition and the affidavits submitted by both the plaintiffs and defendants. However, in both *Camp v. Pitts, supra* at 142–143, 93 S.Ct. 1241, and *Overton Park,*[65] *supra* 401 U.S. at 420, 91 S.Ct. 814, the Supreme Court recognized that there are occasions when the reviewing court is justified in going beyond the limited administrative record. Although

63. The only other conceivable standards are the "de novo" review provided for by 5 U.S.C. § 706(2)(F) and the "substantial evidence" test of 5 U.S.C. § 706 (2)(E). Both *Overton Park, supra,* and *Camp v. Pitts, supra,* make it clear that these approaches are not applicable here. See *A. O. Smith, supra* at 1005.

64. Memorandum in Support of Defendants' Motions for Summary Judgment and Opposition to Plaintiff's (sic) Motions for Preliminary Injunction at 8–9, n. 1 (Docket Item 35, C.A. No. 75–104).

65. The present proceeding, as did *Overton Park, supra,* involves agency action that cannot be classified as either adjudicatory or rule making. See *Texas v. EPA,* 499 F.2d 289, 296 (C.A.5, 1974).

an inquiry of this nature should, as a general rule, be avoided, *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *South Terminal Corp. v. EPA*, 504 F.2d 646, 675 (C.A. 1, 1974); *National Nutritional Foods Ass'n v. FDA*, 491 F.2d 1141 (C.A. 2, 1974), *cert. den.* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113, it is essential in this case in order for the Court to have sufficient information to consider rationally the Commission's actions. *See Nuclear Data, Inc. v. AEC*, 364 F. Supp. 423, 425 (N.D.Ill.1973).[66]

Three sources of information not found in the record [67] have been offered to the Court; the deposition of the Commission's engineer and accident data program manager, Robert L. Northedge; the affidavit of Vice Chairman Newman; and affidavits of officers of the plaintiffs.[68] Proper analysis of the uses of the Northedge Deposition and Newman Affidavit in these proceedings requires that descriptions of the data and the Commission's procedure for processing the data be separated from possible explanations of the Commission's decision to release the accident data. Before it can reasonably apply the appropriate legal standards, the Court must first be apprised of the nature of data collected, the value of the data and computer printout to someone studying TV-related accidents, and the means by which the Commission collected and processed the data. The Northedge Deposition and the first twenty-eight paragraphs of the Newman Affidavit provide that information. Neither probing the mental processes of the Commission's officials nor seeking knowledge outside the Commission's own limited sphere is involved.

On the other hand, paragraph 29 of the Newman Affidavit cannot be considered because it constitutes the most egregious type of "post-hoc rationalization" condemned in *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), and *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The record suggests and the Newman Affidavit clearly states that the Commission relied upon the Cull Memorandum in reaching the decision to disclose the accident data.[69] This memorandum offers the only substantially contemporaneous explanation for the decision.[70] The other purposes set

---

**66.** In somewhat similar circumstances, a district court has been ordered to hold an evidentiary hearing before applying the "arbitrary and capricious" standard. For example, in *Charles River Park "A", Inc. v. HUD*, 519 F.2d 935 (C.A.D.C., 1975), the plaintiffs sought to prohibit HUD from disclosing to Boston's Commissioner of Assessing certain financial information that had been submitted during the course of securing FHA-insured mortgages. The Court of Appeals instructed the reviewing court to conduct an evidentiary hearing but also ordered the review to be carried out under the "abuse of discretion" provision, also under 5 U.S.C. § 706(2)(A), which the Court for convenience referred to as the "arbitrary and capricious" standard. *Cf. Maryland-National Capital Park & Planning Comm. v. U.S. Postal Service*, 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973).

**67.** The "record" here encompasses more than the materials contained in the Commission's purported official record. Internal Commission memoranda and even plaintiffs' communications to the Commission can be examined to determine if the Commission should have been aware of certain issues.

**68.** The affidavits submitted by the plaintiffs are essential to establish irreparable harm required before a preliminary injunction can be issued. However, the Court has not considered plaintiffs' affidavits in evaluating the propriety of the Commission's actions.

**69.** Newman Aff'd, par. 19.

**70.** It should be noted that the Cull Memorandum does not discuss all legal arguments offered to the Commission in opposition to disclosure. However, in an informal administrative proceeding, it is not mandatory that the substantially contemporaneous writing relied upon and adopted by the Commission specifically reject every contention. *Cf. Consumers Union of the United States v. Consumer Product Safety Commission*, 491 F.2d 810, 812 (C.A. 2, 1974).
The picture is further clouded by the Commission's failure to comply with its representation to the manufacturers that the Sec-

forth in the Newman Affidavit are "post-hoc rationalizations" which the Court is precluded from considering as a basis for administrative decision.[71]

## IV. PRELIMINARY INJUNCTION

■ Before preliminary injunctive relief may be granted, plaintiffs must show (1) a reasonable probability of eventual success on the merits and (2) that they will suffer irreparable harm *pendente lite* if relief is not granted, and, furthermore, the Court must consider (3) the impact of its decision on other interested persons and (4) the public interest. *Oburn v. Shapp*, 521 F.2d 142, 147 (C.A. 3, 1975); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (C.A. 3, 1974); *A. O. Smith Corp. v. FTC*, 396 F.Supp. 1108, 1117–20 (D.Del.1975) (appeal pending); *Bowers v. Columbia General Corp.*, 336 F.Supp. 609, 613 (D.Del.1971).

### A. *Reasonable Probability of Eventual Success.*

"It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp, supra,* at 148.

■ Congressional interest in securing manufacturers' cooperation [72] and establishing a harmonious but effective relationship between the manufacturers and the Commission is reflected in 15 U.S.C. § 2055(b)(1), which provides in pertinent part:

"The Commission shall take reasonable steps to assure, prior to its public disclosure thereof, [1] that information from which the identity of such manufacturer or private labeler may be readily ascertained is accurate, and [2] that such disclosure is fair in the circumstances and [3] reasonably related to effectuating the purposes of [the Act]."

Thus, before the Commission may release information to the public, a three step analysis must be satisfied. Failure to comply with any one of the standards means that disclosure would be improper.

At the outset, the Court is confronted by the Commission's oblique suggestion that § 2055(b)(1) may never apply where the information has been requested under the Freedom of Information Act, 5 U.S.C. § 552.[73] However, sepa-

---

retary would make the initial determination which in turn could be appealed to the full Commission. See note 48, *supra*. Deviations from ideal procedure have been viewed as a basis for relaxing the typically close confinement to the administrative record. *Sierra Club v. Hardin*, 325 F.Supp. 99 (D.Alaska 1971).

Denial of promised administrative appeal and the general inadequacy of the record as a factual basis for review have caused the Court to consider remanding the proceedings to the Commission. *See, e. g., Secretary of Labor v. Farino*, 490 F.2d 885, 890–893 (C. A. 7, 1973); *Shannon v. HUD*, 436 F.2d 809 (C.A. 3, 1970). Both *Overton Park, supra,* and *Camp v. Pitts, supra,* conferred broad discretion without much guidance on the district courts to determine the appropriate procedures for clarifying the administrative record. *A. O. Smith, supra* at 1012. Under the circumstances—a recently formed agency engaged in an informal proceeding—it does

not seem necessary to remand the matter to the Commission. The Northedge Deposition and portions of the Newman Affidavit provide the Court with an adequate foundation for decision. Indeed, if these sources could not be used, it would be necessary to remand the case to the Commission with instructions to describe in detail the procedure followed in obtaining and processing the data.

71. The Court does consider these arguments when it evaluates the public interest in denying or granting preliminary injunctive relief. See IV C, *infra*.

72. *See, e. g.*, 118 Cong.Rec. 31378–79 (1972) (remarks of Representative Moss).

73. Memorandum in Support of Defendants' Motion for Summary Judgment and Opposition to Plaintiff's (sic) Motions for Preliminary Injunction, 14, n. 4 (Docket Item 35, C.A. No. 75–104). FOIA requests for the accident data have been received by the

rate statutes regulating disclosure decisions of administrative agencies do have a significant and independent role. *FAA v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975). In *Robertson,* in spite of the language of the FOIA exception protecting matters *"specifically* exempted from disclosure by statute," 5 U.S.C. § 552(b)(3) (emphasis added), a statute [74] granting an agency discretion to withhold or release safety information to the public was found to have continuing viability.[75] The Supreme Court acknowledged that "Congress could appropriately conclude that the public interest was better served by guaranteeing confidentiality in order to secure the maximum amount of information relevant to safety." *Robertson, supra,* 422 U.S. at 267, 95 S.Ct. at 2149.

■ To argue that § 2055(b)(1) becomes irrelevant during the pendency of a FOIA demand is to ignore a clear Congressional concern both for the ac-

curacy of the information disseminated and for the damage that an identified manufacturer might suffer. Congress was aware that FOIA requests for information gathered by the Commission would be forthcoming [76] but, nevertheless, imposed affirmative obligations on the Commission which cannot flippantly be avoided.

■ First, the Commission is charged with the duty of taking "reasonable steps to assure," before disclosure, the accuracy of information from which the identity of the manufacturer can be readily ascertained.[77] It must be emphasized that the Commission is not a guarantor of the accuracy of the information which it releases; [78] to require the Commission to prove that its materials are accurate would raise an insurmountable barrier to disclosure. Instead, an affirmative obligation to "take reasonable steps to assure" that information which it releases is accurate has been imposed on the Commission.[79] To

---

Commission. Newman Aff'd, pars. 11–14, 20.

74. 49 U.S.C. § 1504.

75. Indeed, the problem of "repeal by implication" facing the Supreme Court in *Robertson,* 422 U.S. at 265–66, 95 S.Ct. 2140, is not present here because the FOIA (1966) was enacted before the Act (1972). The 1974 FOIA amendments, P.L. No. 93–502, did not alter the FOIA's impact in these circumstances.

76. *E. g.,* Hearings on H.R. 8110, H.R. 8157, H.R. 260 (and identical bills) and H.R. 3813 (and identical bills) Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 92d Cong., 1st & 2d Sess. 897–98 (1972) (statement of Mr. Nader).

77. Because the manufacturers are expressly identified, it is not necessary to delineate the contours of the "readily ascertainable" standard of § 2055(b)(1). Each accident report is in a separate file that contains, inter alia, the manufacturer's name. Newman Aff'd, par. 17. The computer printout also identifies the manufacturer whose product allegedly generated that line item. Cull Memorandum, p. 2.

78. However, H.R.Rep.No.1153, 92d Cong., 2d Sess. 32 (1972) states that "the Commission

has a responsibility to assure that the information which it disseminates is truthful and accurate."

79. The Report of the House Committee on Interstate and Foreign Commerce suggests the underlying rationale for restricting the Commission's discretion to disclose data that it has collected.

"If the Commission is to act responsibly and with adequate basis, it must have complete and full access to information relevant to its statutory responsibilities. Accordingly, the committee has built into this bill broad information-gathering powers. It recognizes that in so doing it has recommended giving the Commission the means of gaining access to a great deal of information which would not otherwise be available to the public or to Government. Much of this relates to trade secrets or other sensitive cost and competitive information. Accordingly, the committee has written into section 6 [15 U.S.C. § 2055] of the bill detailed requirements and limitations relating to the Commission's authority to disclose information which it acquires in the conduct of its responsibilities under this act." H.R.Rep.No.1153, 92d Cong., 2d Sess. 31 (1972).

determine whether the Commission complied with the requirement, the Court must consider both the means selected to gather the data and the procedure employed to process the data.

■ The Commission strenuously argues that its method fulfilled the statutory mandate of taking reasonable steps for assuring accuracy, but it is difficult to accept this contention on review of the Commission's data-gathering activities.[80] The company that submitted only accurate reports would not have complied with the requirements of the subpeona because production of all reports—verified or unverified—was ordered by the Commission. One is at a loss to understand how demanding submission of inaccurate data constitutes a reasonable step in assuring the accuracy of information which it will eventually disclose.

■ The Commission, however, argues that since the reports were submitted by the manufacturers, it cannot be held responsible for the accuracy of the reports. This attempt to shift responsibility for assuring accuracy fails because the duty to take reasonable steps for assuring accuracy was placed on the Commission—not the manufacturers. There is no indication that Congress

sought to require manufacturers to investigate each accident report received.[81]

Furthermore, the word "information" as used in § 2055(b)(1) embodies a concept of more than just empirical data. It is especially important to be aware of the impression that will be created by release of the data when the primary purpose for disclosure is to enable comparative safety shopping. Ambiguities in the definition of "TV-related accident" caused some manufacturers to submit only reports of fires and electrical shocks while other manufacturers submitted all accident reports. The Commission was made aware of this potential confusion before it issued its subpoenas but, apparently, refused to take any steps to ameliorate the situation. Furthermore, the Commission never sought to remedy the incomplete responses of some manufacturers to the subpoenas [82] even though the Commission had ample powers to compel compliance. 15 U.S.C. § 2076(c). Clearly defining the data that it sought and seeking full compliance with its subpoenas were but two reasonable steps which the Commission could have taken to assure that the information was accurate.[83]

■ On the other hand, the procedures followed by the Commission in pro-

80. The Court does *not* suggest in any way that issuing subpoenas duces tecum for all accident data—accurate or inaccurate—was improper. The Commission is the best judge of what is needed for its own internal purposes. In fact, the limitations on disclosure of 15 U.S.C. § 2055 which protect manufacturers enhance the argument for conferring broad subpoena powers on the Commission. If manufacturers do not have to fear the adverse effects of inaccurate Commission releases, they will be less likely to resist efforts to obtain accident data essential for the Commission's safety standard efforts.

81. Because a manufacturer does not have a duty to investigate accident reports, the Commission's gratuitous offer to allow the manufacturers to challenge the validity of individual accident reports (Aff'd of Sheldon D. Butts, Ass't Secretary of the Commission, par. 2, Docket Item 35, C.A. No. 75–104) does not satisfy the Commission's statutorily imposed duties. The Commission

also asserts that it has faithfully satisfied its statutory obligation by merely passing on without error the data submitted by the manufacturers. This argument also ignores the fact that it is the Commission which has the responsibility of striving to make its releases accurate.

82. Evidently, varying degrees of compliance did not bother the Commission because it believed that it had obtained sufficient data to enable it to begin the process of defining safety standards. (Northedge Dep. p. 260).

83. On the other hand, the uneven quality of record-keeping among the manufacturers was beyond the control of the Commission. While the company which had the best record-keeping operation would, in effect, be punished for its efforts, no reasonable steps were open to the Commission to correct the source of misleading impressions.

cessing the raw reports were reasonable for assuring accuracy of the information gathered. The careful initial supervision and later random checks were adequate to assure proper transfer of the data obtained to the summary sheets.[84] It appears that standard practices were followed in keypunching and obtaining the computer printout. Finally, while the manufacturers contend that not all duplicates were eliminated,[85] the duplication search also would seem to have been reasonable in the circumstances.

Second, before release of the TV-related accident data can be permitted, disclosure must be "fair in the circumstances." Fairness obviously is a concept that eludes precise definition. Because of the Commission's decision to subpoena unverified reports, the ambiguity of the subpoena, the failure of the Commission to seek compliance by all manufacturers and the differing quality of record-keeping, it is conceded that a comparison of the accident data to determine the relative safety of the various manufacturers' products would be improvident and misleading. However, the only caveat which the Commis-

sion proposes to release with the public disclosure relates to one source of error only—the differing qualities of record-keeping. Apparently, nothing will reflect the other sources of possible error.

■ Basically, the Commission proposes to release information that could unjustifiably damage [86] the manufacturers because the data does not form a reliable foundation for safety comparison—the only contemporaneous reason given by the Commission for the release of the information. Moreover, the public would be misled by the Commission's efforts. Although fairness is difficult to define, it is even more difficult to determine how disclosure of this information would be "fair in the circumstances." [87]

■ Third, it must be determined whether disclosure is "reasonably related to effectuating the purposes of [the Act]." Only one reason for disclosure was set forth in the contemporaneous Cull Memorandum upon which the Commission relied in deciding to release the information: "The release of the accident data would assist consumers to better evaluate the safety of TVs."[88]

84. The data processing phase is described in the text accompanying notes 24–35, *supra*.

85. *E. g.*, Affidavit of John F. Eisenmann, Manager, Consumer Technical Affairs, Aeronutronic Ford Corp., pars. 7, 10. (Docket Item 22, C.A. No. 75–116). Perhaps it is inappropriate to consider these affidavits because, as indicated at notes 64–71 and accompany text *supra*, they are not part of the administrative record. It is, however, unclear when the printouts were first made available to the companies. If the printouts were not released until after the Commission had made its decision, the companies would not have had any opportunity to comment in a timely fashion to the Commission on the official record. In light of the Court's conclusion on the substantive issue raised by the affidavit, it is not necessary to decide whether the allegation is properly before the Court.

86. The potential harm to plaintiffs is discussed at IV (B) *infra*.

87. The Commission in attempting to reduce this data to an intelligible format has unin-

tentionally aggravated the problem. A clear computer data listing, with its immediate impact, creates an impression of accuracy that far outshines several filing cabinets of jumbled accident reports.

Furthermore, despite the Commission's contentions to the contrary (Memorandum In Support of Defendant's Motion for Summary Judgment and Opposition To Plaintiff's (sic) Motions for Preliminary Injunction, p. 15, Docket Item 35, C.A. No. 75–104), the release of this information by a government agency carries with it an aura of authenticity which cannot be ignored in determining whether the disclosure is "fair."

88. Cull Memorandum, p. 5.

The administrative record indicates that this was the only contemporaneous explanation for the Commission's decision to disclose. See notes 52–53 and accompanying text *supra*. The "post-hoc rationalizations" of the Newman Affidavit, while not appropriate for consideration here, are addressed when the preliminary injunction issue of harm to the public is reached. See IV (B) *infra*.

One of the purposes of the Act is "to assist consumers in evaluating the comparative safety of consumer products." 15 U.S.C. § 2051(b)(2). Therefore, if it were possible to use this information to contrast the safety records of the various manufacturers, disclosure would be reasonably related to achieving the goals of the Act. However, it is clear that the materials which the Commission proposes to disclose cannot aid consumers in determining which television manufacturer has the safest product, and therefore would not be "reasonably related to effectuating the purpose of [the Act]."

Accordingly, plaintiffs have convinced the Court that they have a reasonable probability of success in showing that the Commission failed to "take reasonable steps to assure" that the accident information would be accurate, that disclosure would not be "fair in the circumstances" and would not be "reasonably related to effectuating the purpose" of the Act.[89]

### B. *Irreparable Harm.*

The plaintiffs aver, by way of verified complaint and affidavit,[90] that release of the data to the public would irreparably injure their goodwill and reputations by generating unwarranted adverse publicity. Furthermore, they contend that their competitive positions would be unfavorably affected by public disclosure of sensitive, confidential trade and commercial information.

■ "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11 Wright & Miller, Federal Practice and Procedure § 2948, p. 431 (1973). The plaintiffs' reputations would suffer substantially from the Commission's release of misleading safety information.[91] This risk is not merely speculative, and furthermore the irreparable nature of injury to commercial reputations has been widely recognized. *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189–90 (E.D.N.Y.1972); *Cutler-Hammer, Inc. v. Universal Relay Corp.*, 285 F.Supp. 636, 639 (S.D.N.Y.1968).

The information which the Commission proposes to release would not normally have been made public by the plaintiffs, and it appears that the data would appropriately be deemed confidential.[92] The planned disclosures would undoubtedly harm the plaintiffs by giving their competitors access to sensitive information.

Furthermore, once the information is disseminated, the Court becomes powerless to protect or to restore the status quo pending a final determination of the merits. A preliminary injunction is especially appropriate where the action sought to be enjoined would "impair the court's ability to grant an ef-

---

The memorandum also urges disclosure in response to the "overriding health and safety issues involved." The Commission obtained the accident reports by early fall of 1974 but did not decide to release them until the spring of 1975. Thus, the Commission, by its own actions, has indicated that time is not of the essence. A generalized warning of the hazards encountered while watching television would not have required identification of the manufacturers. See note 93 *infra*.

89. In light of the Court's resolution of the issues raised under 15 U.S.C. § 2055(b)(1), it is not necessary to consider the other contentions urged by the plaintiffs for preliminary injunctive relief.

90. *E. g.*, Affidavit of Fred R. Wellner, General Manager, Television Receiver Products Dept., General Electric Co., pars. 4–14 (Docket Item 11A, Ex. A–Aff., C.A. No. 75–136).

91. "When the Government focuses adverse publicity on named parties, the consequences to such parties can be disastrous." Gellhorn, Adverse Publicity by Administrative Agencies, 86 Harv.L.Rev. 1380, 1381 (1973).

92. Plaintiffs also argued that the data constituted either trade secrets or other protected confidential information. The Court did not reach these issues and uses the word "confidential" here in a more colloquial sense.

fective remedy." 11 Wright & Miller, Federal Practice and Procedure § 2948, p. 434 (1973).

Thus, the Court finds that disclosure as proposed by the Commission would irreparably harm the plaintiffs. *See Sims v. Greene,* 161 F.2d 87 (C.A. 3, 1947).

### C. *Impact On Other Interested Persons And The Public Interest.*

 The Court must also consider the consequences of its decision on both interested persons and the public in general. *Delaware River Port Authority v. Transamerican Trailer Transport, Inc., supra.* First, the Commission would not be significantly affected by issuance of a preliminary injunction preventing release of the accident data. The primary objective—obtaining enough data to be able to promulgate safety standards—has been achieved.

 Second, in order for a preliminary injunction prohibiting disclosure to harm the public, disclosure first would have had to have been beneficial to the public. The Commission has urged that publicizing the information would assist the public in comparing the safety of various television models.

However, it is clear that the data, subject to many potential sources of inaccuracy, simply cannot provide a rational basis for comparative safety shopping.

The Commission also asserts that disclosure would warn the public of hazards associated with the operation of televisions and would suggest questions to ask when purchasing a television, but these two goals could be achieved without releasing the identity of the manuturers.

 Finally, the Commission suggests that the data might be useful to other parties interested in investigating the safety of television receivers. First, the rather speculative benefit is not very significant when compared to the immediate and direct injury that would fall on the plaintiffs if the data were released to the public. Second, it is appropriate to recognize in deciding whether to grant temporary relief that the public interest in the safety investigation is being protected by an energetic and capable Commission investigation.

 In sum, it is difficult to perceive how the public interest would be harmed by enjoining the disclosure of information of dubious accuracy.[93]

93. In their memoranda and at oral argument, the parties devoted little attention to the Yereance Report. See notes 36–37 and accompanying text, *supra.* Nevertheless, it appears that plaintiffs still seek to bar its release to the public. (Docket Item 42, p. 3, C.A. No. 75–104).

The Yereance Report mentions the manufacturers twice. First, in parallel vertical columns the manufacturers and their respective Commission filing numbers are listed. (A–7) No accident information is revealed, and, furthermore, the filing numbers are not used elsewhere in the report. Second, the report describes the layout of the computer printout and indicates that the printout identifies the manufacturers. (B–4) The names of manufacturers who could be listed are set forth, and, of course, the plaintiffs are included. Again, no accident information is discussed in conjunction with mention of the manufacturers. Thus, while the Yereance Report is a sobering study of the physical dangers that one may encounter while watching television, the manufacturers are in

no way singled out for special attention. There is nothing in the Yereance Report that relates or links accident data to a particular manufacturer.

Therefore, it appears that public dissemination of the Yereance Report would not harm the manufacturers. The absence of irreparable harm is an appropriate basis for declining to grant preliminary injunctive relief. *Commonwealth of Pennsylvania ex rel. Creamer v. United States Department of Agriculture,* 469 F.2d 1387, 1388 (C.A. 3, 1972).

Furthermore, public interest considerations militate against enjoining disclosure. The Yereance Report represents a straightforward, easy to read document that can inform the public of television hazards. Balancing the benefits of the disclosure against the minimal adverse consequences that might affect the television manufacturing industry as a whole indicates that enjoining disclosure of the Yereance Report would be improper.

Thus, the Court will not issue a preliminary injunction prohibiting disclosure of the Yereance Report.

Accordingly, the Court finds that it is appropriate to preliminarily enjoin the disclosure to the public of the accident data and the computer printout.

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52, F.R.Civ.P.

An order will be entered in accordance with this opinion.